STOOPS *v.* BANK OF BRINKLEY.

Opinion delivered November 15, 1920.

1. CONTRACTS—CONSTRUCTION.—The first rule of construction of contracts is to give to the language employed by the parties to a contract the meaning they intended, and it is the duty of the court to do this from the language used where it is plain and unambiguous.

2. EVIDENCE—PAROL EVIDENCE TO EXPLAIN CONTRACT.—Where the language of a contract is clearly susceptible of but one meaning, parol evidence to vary its terms is not admissible; but where its meaning is doubtful, or it is susceptible of more than one meaning, parol evidence may be resorted to for the purpose of showing the real nature of the agreement.

3.  EVIDENCE—PAROL EVIDENCE AS TO AMBIGUOUS CONTRACT.—While parol evidence to aid in the construction of an ambiguous written contract is admissible to show the subject-matter of the agreement, the circumstances surrounding its execution and the conduct of the parties under it, the parties will not be permitted to testify as to their construction of the language used.

4.  MORTGAGES—AGREEMENT FOR PARTIAL RELEASE.—Where a mortgage given to secure the purchase price of lands stipulated that when the purchase price of $10 an acre should be paid on part of the lands a release should be made on the margin of the record releasing so much of the land sold, and it is shown that this clause was inserted to meet the purchaser's objection that he might be unable to pay the entire sum, and to enable him to acquire the portion for which he did pay, such release discharges the land so paid out not only from the mortgage but from the indebtedness secured thereby, so that it was not subject to attachment in a suit to foreclose the mortgage, even though it was still the property of the purchaser, and he was personally liable for the debt secured by the mortgage.

5.  SUBROGATION—STATE'S LIEN FOR TAXES.—Where an attaching creditor paid taxes on the attached property, and the attachment is subsequently dissolved, the creditor is entitled to be subrogated to the State's lien for such taxes.

Appeal from Monroe Chancery Court; *John M. Elliott,* Chancellor; reversed.

STATEMENT OF FACTS.

On the 5th day of June, 1915, appellees brought this suit in equity against appellants to foreclose a deed of trust on real estate and also to attach other real estate on the ground that appellants were nonresidents. Appellants admitted the execution of the deed of trust sued on, and the foreclosure of the same, but defended the suit on the ground that the land attached had been released from the debt sued on.

Appellants, George B. Stoops and Gesina A. Stoops, his wife, live in Chicago, Illinois, and have lived there since before they purchased the land involved in this suit in September, 1912. George B. Stoops was a witness for himself. According to his testimony he was looking around to buy a good section of cut-over land in Arkansas, and Handford F. Donnelly came to see him

with reference to selling him some land. Donnelly told Stoops that he would show him over 1,760 acres of land and that if any of it suited Stoops he could have any portion of it at the same price. Stoops came to Arkansas and looked at the land in Monroe County, which is involved in this suit, and told Donnelly that section 12 was satisfactory to him. Donnelly finally told Stoops that he could not get section 12 without taking the whole tract. Stoops told Donnelly that he would not be able to do that because he did not have the money to handle a deal of that size. Donnelly replied that suitable terms would be made; and that he could sell all the land that he did not want for more than he was paying for it. Stoops finally told Donnelly that he would take it provided they would make a clause releasing him entirely from all encumbrances on any portion that he should pay off, in order that he might sell or do as he wished with it. Donnelly said that it would be all right.

We here copy from the record from the testimony of George B. Stoops the following:

"Q. State whether or not it was agreed that the plaintiff should hold the balance of the land which you had not paid off in full as full security for the balance of the debt.

"A. They were to hold the balance of the land after releasing whatever portions were released. They were to hold the balance for the remaining debt.

"Q. Was anything said about whether or not you would be required personally or otherwise to pay any of the balance of the debt except that the same would be secured on the real estate not released?

"A. There was nothing said about that. I was not to be held for anything except the balance of the mortgage on the remaining land, that is the mortgage against the land. I was not to be held for anything personally against it.

"Q. Then the land was to be held as full security for the debt?

"A. The land that was still not released was to be held for security, not what was released was to be held.

"Q. You understood from the deed of trust that you would have a perfect right to sell the land that was released?

"A. I did understand that, and that was the intention of having it done that it could be sold and there could be no claim come on it whatever."

Stoops at first thought the land he was purchasing belonged to Donnelly, but afterward ascertained that it belonged to the Bank of Brinkley. On the 14th day of September, 1912, the parties entered into a written agreement whereby Stoops was to purchase the whole 1,760 acres of land for $10 an acre, making an aggregate of $17,600. Part of this amount was to be paid in cash and the balance on deferred payments. A deed of trust was to be given to secure the balance of the unpaid purchase money. On the 28th day of October, 1912, George B. Stoops and Gesina A. Stoops, his wife, executed a deed of trust to G. Otis Bogle, trustee, for the Bank of Brinkley on the whole 1,760 acres to secure the unpaid purchase money which amounted to $12,000 as evidenced by nine promissory notes. After describing the notes for the deferred payments, the deed of trust conains the following: "All notes bearing interest from date until paid at the rate of eight per cent. per annum, interest payable annually on the 28th day of October of each year, and if default be made in the payment of said notes or either of them, or interest thereon when due, then all of said notes are to become due and payable upon such default, it being expressly understood, however, that said grantors, their heirs or assigns, shall have the right to sell all or any part of said land upon the payment to the holder of said notes the sum of ten ($10) dollars per acre on the land so sold, and, upon the payment of said sum, said notes are to be credited with the amount paid thereon and a release made on the margin of the record of this instrument releasing the part of

land sold by the grantors herein; it being further understood, that any such payment so made shall be made on the notes first falling due.''

On cross-examination by Mr. Bogle, Mr. Stoops testified as follows in regard to the release clause which we have just copied:

''Q.  I said no more to you or made you no other promises than is set forth in the deed of trust, did I?

''A.  Well, nothing further than you said that I should have the right after this was released to do what I pleased with the land; it was mine and there would be no more claim against it, that I could do as I pleased sell it to any one.  You said that.

''Q.  Do you mean to say that after this land was released that you were not personally responsible for the payment of the notes that had not been paid?

''A.  I mean to say that it was my understanding that the remaining land was to be security for the notes.

''Q.  But you did not understand that you would be released from the payment of these notes, did you, Mr. Stoops, that had not been paid?

''A.  Well, I did understand that I would be released except that they would hold the land for it, but not what had been released.

''Q.  You understood then that you were responsible for the payment of the notes, did you not?

''A.  Not anything further than the security of the remaining land.  It was my understanding that, after I had paid as much as the full purchase price for the release of the land after what was paid in the beginning, that the land was to be entirely free.''

On August 1, 1913, Stoops found out that he could not obtain the money to pay for the entire tract of land and elected to purchase 320 acres and pay $10 an acre therefor in accordance with the provisions of the deed of trust.  He paid $3,413.23 for the 320 acres and a release deed was executed to him by Bogle as trustee.  The deed recites that it was executed in conformity with the pro-

visions in the deed of trust, and that it was not intended to release any other land mentioned and described in the deed of trust. Altogether, Stoops paid about $9,000 on the purchase price of the whole 1,760 acres. This includes the amount paid for the 320 acres described in the release deed.

The trustee, G. Otis Bogle, who also was a director in the bank and an attorney therefor, testified in regard to the release clause in the deed of trust. We copy from the record as part of his testimony as follows:

"Q. Explain the following clause in the deed of trust executed by Geo. B. Stoops to the Bank of Brinkley, to secure the deferred payments, as follows:

"It being expressly understood, however, that said grantors, their heirs or assigns, shall have the right to sell all or any part of said land, upon payment to the holder of said notes the sum of $10 per acre on the land so sold, and upon the payment of said sum said notes are to be credited with the amount paid thereon and release made on the margin of the record in this instrument, releasing the part of the land sold by the grantors herein."

"A. At the time this matter was up, Stoops wanted this clause in the deed of trust, so that, in the event he wanted to dispose of certain portions of this land, he could do so, by paying $10 per acre, but there was no understanding with the Bank of Brinkley that it would not hold him personally responsible for whatever might remain due, after the foreclosure on the land that had not been released."

He further testified that it was not the understanding that the bank should hold as absolute security the land not released. He and other officers of the bank also testified that Donnelly was not connected with the bank and was not the agent of the bank in making the sale of the lands. Bogle said that Donnelly made a contract to purchase the land himself at $7 per acre and resold it to Stoops at $10 per acre. The bank then contracted

directly with Stoops. Stoops failed to pay the note for the purchase money which fell due in October, 1914. By the terms of the mortgage, if default was made in the payment of any note, all the notes became due. The bank then brought this suit to foreclose the mortgage and also attached the 320 acres of land embraced in the release deed on the statutory ground that appellants were nonresidents of the State.

The chancellor found that the balance due on the mortgage, principal and interest, amounted to $9,989.22, with interest at the rate of 8 per cent. per annum from March 20, 1916. The land embraced in the deed of trust was ordered sold in payment of this amount, and it was further decreed that if it did not sell for enough to pay the whole indebtedness the land attached should be sold to pay the deficiency. There was a deficiency of $2,359.52, after the land was sold under the foreclosure decree, and it was further decreed that the 320 acres of land embraced in the release deed should be sold under the attachment proceedings to pay this deficiency. Appellant prosecutes this appeal to reverse that part of the decree sustaining the attachment and ordering the land attached sold for the payment of the deficiency in the mortgage indebtedness.

*C. F. Greenlee,* for appellants.

Appellees had the right to retain or dispose of the 320 acres of land described in the release deed. The intention of the parties is plain. The land attached had been released from the debt sued upon. Appellants depend upon the plain contract made between the parties and ask that it be enforced. The Bank of Brinkley has not been defrauded out of a cent, and appellees have not come into court with clean hands; they have offered to return the $3,413.23 to appellants which they paid out for the land. 27 Cyc. 1415; 127 Ark. 577-583; 41 Minn. 14. The judgment here shocks one's sense of justice.

*Lee & Moore,* for appellees.

The case should be affirmed, as, when one executes a note for a valuable consideration, he should be required to pay same, and, when he refuses, his property should be sold to satisfy a judgment rendered on the note.

HART, J. (after stating the facts). It is the contention of counsel for appellants that under the release clause contained in the deed of trust, the 320 acres of land described in the release deed, and which were attached, could not be made liable for any part of the indebtedness secured by the deed of trust.

On the other hand, it is the contention of appellees that the release clause in the deed of trust only released the 320 acres described in the release deed from the mortgage, but that it was not the intention to release it from the debt secured by the mortgage. Appellees contend that, if the property still remaining in the deed of trust did not sell for a sufficient amount to pay off the indebtedness secured by the deed of trust, appellants would be liable for the deficiency, and that, because they were nonresidents, the 320 acres described in the release deed could be attached under section 344 of Kirby's Digest and sold to pay such deficiency. This brings us to a consideration of the release clause. It follows in the deed of trust immediately after the description of the notes, and for the sake of convenience we will again copy it:

"All notes bearing interest from date until paid at the rate of eight per cent. per annum, interest payable annually on the 28th day of October of each year, and if default be made in the payment of said notes or either of them, or interest thereon when due, then all of said notes are to become due and payable upon such default, it being expressly understood, however, that said grantors, their heirs and assigns, shall have the right to sell all or any part of said land upon the payment to the holder of said notes [of] the sum of ten ($10) dollars per acre on the land so sold, and, upon the payment of said sum, said

notes are to be credited with the amount paid thereon and a release made on the margin of the record of this instrument releasing the part of land sold by the grantors herein. It being further understood, that any such payment so made shall be made on the notes first falling due."

The majority of the court is of the opinion that it was the intention of the parties to release from the indebtedness secured in the deed of trust any portion of the land which should be selected and paid for by appellants at the rate of $10 per acre and that the deed of trust executed on the first day of August, 1913, which recites the payment of $3,413.23, releases from the indebtedness sued on the 320 acres of land described in it and ordered sold under the attachment proceedings. We think this intention is plain from the language of the release clause in the deed of trust. In any event, the majority of the court is of the opinion that the language of the contract is so doubtful and uncertain that resort may be had to parol evidence to explain it, and to show the real situation of the parties when it was executed.

The first rule of interpretation is to give to the language employed by the parties to a contract the meaning they intended. It is the duty of the court to do this from the language used where it is plain and unambiguous. Where the language is clearly susceptible of but one meaning, parol evidence to vary the terms of a written contract is not admissible. Where the meaning of the language of the contract is doubtful, or is susceptible of more than one meaning, parol evidence may be resorted to to show the real nature of the agreement. The admission of such testimony is, within the meaning of the terms employed in the written contract, to render certain that which is uncertain and to determine just what in fact the writing was intended to express. *Brown & Hackney* v. *Daubs*, 139 Ark. 53, and cases cited; *Johnson* v. *Mo. Pac. Rd. Co.*, 139 Ark. 507, and cases cited;

*Railway* v. *Shinn,* 52 Ark. 93, and *Weis* v. *Meyer,* 55 Ark. 18.

In this case the parties have introduced the parol testimony of the appellants and of the attorney for the appellees who prepared the deed of trust to construe the language of the release clause in the deed of trust. This can not be permitted. The parties can only show the subject-matter of the agreement, the circumstances surrounding its execution and the conduct of the parties under it as a means of interpreting the language used. *Watkins* v. *Greer,* 52 Ark. 65, and *Dugan* v. *Kelly,* 75 Ark. 55. Turning on the light of parol evidence showing the surrounding circumstances and motives and actions of the parties clears up the obscurity of the language in the contract itself, if there is any. Keeping in mind the position of the contracting parties and the circumstances under which they acted, the parol evidence introduced enables the court to determine just what the writing was intended to express. At the time the contract was entered into, Stoops only wanted to purchase a section of land. He was induced to purchase the whole tract of 1,760 acres under the promise that a clause would be inserted in the deed of trust given to secure the balance of the purchase money to the effect that he might at any time pay out any part of the land at the rate of $10 per acre and secure a deed of release thereto. Stoops paid a part of the purchase money in cash and gave a mortgage on all of the land to secure the balance, amounting to about $12,000. Thus it will be seen that he had paid over $5,000 of the purchase money at the time the deed of trust was executed. When he found out that he could not pay out the land, he elected to pay out a part of it and secure its release from the mortgage and secured the release deed above referred to from appellees. If the release deed only released the land embraced in it from the deed of trust or the mortgage, it is manifest that it would be of but little practical benefit to appellants. The release clause was made for his ben-

efit in case he could not pay out all of the indebtedness secured by the deed of trust. It would do him but little good to have the land released from the mortgage if it could be at once attached and thus again be made subject to a lien to pay off the mortgage indebtedness. The parties at the time the deed was executed knew that appellants were nonresidents and would continue to remain so. They must be presumed to have known that, as such nonresidents, the property, if released from the mortgage, would at once become subject to attachment and thus again appellees would have a lien on it for the payment of the mortgage indebtedness.

Therefore we think that the purpose of the release clause was to release from the mortgage indebtedness, and not merely from the mortgage, such portion of the land embraced therein which should be paid for at the stipulated price of $10 per acre. This construction is evidently the one placed upon it, not only by Stoops himself, but by Bogle, who represented the bank as its attorney, and who was also named as trustee in the deed of trust. We have copied in the statement of facts his testimony with regard to this point and need not repeat it all here. He was asked the direct question as to the purpose of the release clause in the deed of trust and the material part of it was read over to him. He replied that at the time Stoops wanted this clause in the deed of trust so that, in the event he wanted to dispose of a certain portion of this land, he could do so by paying $10 per acre. He further stated that there was no understanding of the bank that it would not hold him personally responsible for whatever might remain due after the foreclosure on the land that had not been released. So, according to Bogle's own testimony, the evident purpose of the release clause was to have released from the mortgage indebtedness any portion of the land which appellants might pay for at the stipulated price.

As we have already seen, it would be of but little practical use to them to merely free it from the lien of

the deed of trust. Stoops could not sell it to any advantage, because all prospective purchasers would know that they were subject to attachment because the mortgagors were nonresidents, and the balance of the mortgage indebtedness had not been paid. Of course, as explained by Bogle, it was not intended to release the mortgagors from personal liability for any deficiency that might remain after the foreclosure of the mortgaged property. We think that it was only intended to release the 320 acres embraced in the release deed from the mortgage indebtedness. The release of the 320 acres from liability for the mortgage indebtedness is quite a different thing from releasing the mortgagors from personal liability. The appellees now could attach any other property that Stoops had in this State and sell it and apply the proceeds to the payment of the deficiency, or appellees could go to the domicile of Stoops and obtain a personal judgment against him and subject his property there to the payment of the deficiency. But a majority of the court is of the opinion that, under the release clause of the mortgage, it was intended to release the 320 acres of land from the mortgage indebtedness, and not merely from the mortgage itself.

Therefore, the decree sustaining the attachment on the 320 acres of land embraced in the release deed of August 1, 1913, will be reversed and the cause will be remanded with directions to the chancellor to dissolve the attachment and to release the 320 acres of land from any lien whatever for the payment of the balance of the purchase money secured by the deed of trust which is foreclosed in this suit.

The court below is directed to allow appellee whatever amount of taxes it has paid on the 320 acres of land in controversy and to make said amount a lien on said lands. He who seeks equity must do equity. The State had a lien on these lands for the taxes, and appellee, having paid them, prevented a sale of the lands for the delinquent taxes, and was therefore not a volunteer in the

matter. The bank is entitled to be subrogated to the rights of the State and to have the taxes so paid by it refunded.

McCULLOCH, C. J. (dissenting). The language of the release clause of the mortgage is, I think, plain and unambiguous. It provides that the mortgagor "shall have the right to sell all or any part of said land upon the payment to the holder of said notes the sum of ten ($10) dollars per acre on the land so sold, and, upon the payment of said sum, said notes are to be credited with the amount paid thereon and a release made on the margin of the record of this instrument releasing the part of land sold by the grantor herein."

It means that land sold by the mortgagor to another person should be released from the lien of the mortgage. No intention is manifested to release anything except the lien. This is plain from the fact that there is no release provided for except in case the mortgagor sells "all or any part" of said land, and this clause gives him the right to do so on payment of the stipulated sum per acre. Conceding that appellant was entitled to the release on the payment of the stipulated sum, without having sold a part of the land, such release was only from the lien of the mortgage, and not from the debt itself in case appellees found an available remedy to enforce the debt in the hands of appellant. If appellant had sold the land thus released, the title passed to his grantee free from the lien. If he had made it his homestead, it could not have been subjected to the payment of appellee's debt. But as long as he owned the land, unless it is his homestead, it is subject to sale for any of his debts—to appellee or anyone else—and for this debt as well as for any other debt.