WHITE RIVER PRODUCTION CREDIT ASSOCIATION *v.* FEARS.

FEARS *v.* VOLENTINE.

4-8421, 4-8427                209 S. W. 2d 294

Opinion delivered March 15, 1948.

4-8421

*Pickens & Pickens,* for appellant.

*L. A. McLin, J. Brinkerhoff* and *Adrian Coleman,* for appellee.

4-8427

*L. A. McLin, J. Brinkerhoff* and *Adrian Coleman,* for appellant.

*Ras Priest,* for appellee.

Ed. F. McFaddin, Justice.   The most important issue on these appeals is the extent and effect of lien waivers, signed by the landlords.   Other questions are incidental to this one.   In case No. 8421, appellees Fears, Bone and Carter are the landlords, and will be so designated.   R. E. Coleman is the tenant.   The appellant White River Production Credit Association (hereinafter referred to as "Association") made advances to Coleman on the strength of the waivers signed by the landlords.   In case No. 8427, the said landlords are the appellants, and Volentine—a *pendente lite* purchaser from the Association—is the appellee.

In October, 1943, Coleman, as tenant, leased 240 acres from Fears, 120 acres from Bone, and 120 acres from Carter.   All of these lands were in Greene county, and were leased by Coleman for rice farming for the 1944 Calendar year.   A written rent contract was executed between Coleman and each landlord, and all contracts were identical except as to land descriptions, parties and dates. Coleman agreed to pay as rent "one-fourth of all monies derived from the sale of rice grown and marketed from said lands."   He represented to each of the three landlords that he would need cash advances to plant, cultivate, harvest and market the rice crop, so in each contract there was this language:

"Lessor by these presents agrees to sign and execute a waiver of his landlord's lien on said crops for the purpose of assisting lessee in procuring a loan thereon."

On November 8, 1943, each of the three landlords executed a written waiver reading as follows:

## "LANDLORD'S WAIVER OF LIEN

"In consideration of the sum of $1.00, the receipt of which is hereby acknowledged, and other valuable considerations, I/we hereby, and by these presents relinquish

and waive unto White River Production Credit Ass'n., its transferees and assignees, all and singular, the priority of any right, claim, interest, equity or lien I/we may have for rent, advances or other indebtedness on, in and to the crops now growing on or to be grown during the year 1944 on lands described in the mortgage executed by R. E. Coleman to White River Production Credit Ass'n. dated the 8th day of November, 1943, to which mortgage this waiver is attached; such waiver to extend to and cover the amount now due under and secured by said mortgage or which may be hereafter secured thereby under the terms thereof, and I/we hereby waive the right to a marshalling,[1] and consent to the collection of said mortgage out of any and all said crops.

"I hereby certify to the said association, its successors or assigns, as an inducement to make the loan, that I have not heretofore executed any assignment or waiver of my said lien in favor of any other person, partnership or corporation.

"Witness my/our hand and seal on this 8th day of November, 1943."

These three waivers were attached to, and became a part of, the mortgage from Coleman to the Association, which mortgage (dated November 8, 1943) recited in part as follows:

"The undersigned R. E. Coleman of the County of Clay, State of Arkansas, (hereinafter referred to as the mortgagor), in consideration of the sum of $21,000 loaned to said mortgagor by White River Production Credit Association (hereinafter referred to as the mortgagee), the receipt of which is hereby acknowledged, and evidenced by note(s) of the undersigned in said amount described as follows:

| Date | Principal Amount | Date of Maturity |
|---|---|---|
| November 8, 1943 | $21,000.00 | December 5, 1944 |

payable to the order of the mortgagee at its office in Newport, Arkansas, with interest from date until paid

---

[1] We are not, here, called upon to discuss the effect of an executory contract to waive the marshalling of assets.

at the rate of 4½ percentum per annum, for the purpose of securing the payment of said debt and the note(s) evidencing the same, and all renewals and extensions thereof, and all additional loans and advances which may hereafter be made by the mortgagee, its successors or assigns, to the mortgagor, whether made before or after the maturity of the note(s) described herein and during the life of this mortgage, whether or not evidenced by note or notes, and any and all other present or future liabilities of the mortgagor to the mortgagee, its successors and assigns, does hereby sell, assign, transfer, set over and mortgage unto said mortgagee, its successors or assigns, the following decribed personal property: . . ." (there follows description of the rice crop to be grown on the farms of the three landlords and also a description of the chattels belonging to Coleman.)

Coleman personally owned approximately 800 acres in Clay county, and had borrowed money from the Association on his 1943 crop. He still owed the Association a balance in excess of $1,000, which was secured by a mortgage on his chattel property. In February, 1944, he applied to the Association for a loan to enable him to make a rice crop on the said Clay county lands. This loan was approved in the sum of $15,000, and a mortgage on the Clay county crop was executed by Coleman to secure not only the said $15,000 loan, but the $21,000 loan previously referred to. The language in the February, 1944, mortgage as to "all additional loans and advances" was the same as in the November, 1943, mortgage, as previously copied.

In 1944, Coleman made a crop on his own lands, as well as on the lands of the landlords; and on the security of the two mortgages previously mentioned, the Association made loans and advances to Coleman in excess of $56,000. These facts appear to be conceded as true:

1. Some of the said money was used by Coleman to pay old debts and personal expenses, and items not connected with the rice crops. One such "old debt" was the said balance due by Coleman to the Association on the 1943 mortgage previously mentioned.

2. The weather in the fall of 1944 was so unfavorable to the harvesting of rice that the major portion of the crop on Coleman's Clay county land was never harvested or marketed.

3. All of the proceeds of the crops gathered from the landlords' lands were not delivered by Coleman to the Association pursuant to the terms of the mortgages: Coleman allowed others to have some of the proceeds.

4. The Association received about $40,000 from the 1944 rice crop of all of the lands, and still had a claim against Coleman for about $16,000 secured by the mortgage of November 8, 1943, on the chattels.

5. The landlords received nothing.

Thereupon, on March 10, 1945, the landlords brought suit in the Greene Chancery Court, naming as defendants the Association, Coleman, Volentine, and others. The complaint alleged, *inter alia*, that the lien waivers were signed by the landlords for the sole purpose of enabling Coleman to obtain money with which to make a crop on the lands of the three landlords; that the Association had no right to charge against the crops grown on the lands of the landlords the total indebtedness of Coleman to the Association, including the old debts and the other advances; that Coleman and the Association had fraudulently induced the landlords to execute the said lien waivers as a part of a scheme to defraud the landlords out of their rents; that the Association had collaborated with Coleman in secreting a part of the crops, and had allowed Coleman to take a portion of the crops away from the payment on the mortgage. The prayer of the complaint was for (1) a judgment against Coleman for the rents of each landlord; (2) an accounting against Coleman and the Association for the crops grown; (3) a fair determination of the advances made for the planting, cultivating, harvesting and marketing of the crops on the lands of the three landlords, including the segregation of their crops from the entire Coleman crops; and (4) a judgment against the Association for the amounts of the plaintiffs' crops received by the Association over and above the amount required for the

repayment to the Association of the money advances by the Association to the planting, cultivating, harvesting and marketing of the crops on the lands of the three landlords. Also, the landlords prayed that they be subrogated to the lien of the Association in its mortgage on the chattels of Coleman, in order to enable the landlords to collect their rents against Coleman.

Contemporaneously with the filing of the complaint, the landlords filed notice of *lis pendens* in both Greene and Clay counties, and described all the chattel property as contained in the Association's mortgage. Thereafter Volentine paid the Association its balance of $16,000 on the Coleman indebtedness, and took an assignment of the indebtedness and the mortgage held by the Association on the Coleman chattels. Then Coleman surrendered the chattels to Volentine, and he disposed of them.[2] By reason of the transactions *pendente lite,* the landlords claimed that Volentine had rendered himself personally liable for their judgments, and they therefore prayed judgment against Volentine. This claim against Volentine is the issue in Case No. 8427 in this court.

All phases of the causes proceeded to trial in the chancery court, being heard entirely on depositions and stipulations. The record is voluminous. The decree of the chancery court found and held:

1. That the landlords were entitled to judgment against Coleman for $9,306.02 as the amount of their rentals, together with interest thereon from April 14, 1945, until paid (the decree segregating the rents due each landlord); 2. that the landlords "are not liable on their waivers for old debts of the defendant R. E. Coleman, nor for the $15,000 mortgage given by him on crops to be grown on (his) said defendant's farm in Clay county, Arkansas, nor any of the money not used in the production of crops raised on plaintiffs' (landlords') lands"; 3. that the Association had received and held, as proceeds from the rice crops grown on the landlords' lands, an amount far in excess of the amount al-

[2] One angle of the Coleman-Volentine litigation was before this court in the case of *Coleman* v. *Volentine,* No. 8185, 211 Ark. 592, 201 S. W. 2d 592.

lowed under the waivers (as they had been limited in paragraph 2, just above) ; 4. that the landlords were entitled to judgment against the Association for the said rents of $9,306.02 and interest (because of the items 2 and 3, above) ; and 5. that the landlords were not entitled to any judgment against Volentine.

From all of the said decree adverse to it, the Association has appealed in case No. 8421; and from that portion of the decree which refused the landlords any judgment against Volentine, the said landlords have appealed in case No. 8427 in this court. There is no appeal by Coleman.

### Case No. 8421

I. *The Waivers.* As previously stated, the first and most important question in this case is the extent and effect of the lien waivers signed by the landlords. We have previously copied the wording of the waivers. The language is about as broad as can be imagined. By its terms, each waiver extends to and covers ". . . the amount now due under and secured by said mortgage or which may be hereinafter secured thereby under the terms thereof . . ." The terms of the mortgage have already been copied. It is security for "all additional loans and advances which may hereafter be made by the mortgagee . . . and any and all other present or future liabilities of the mortgagor to the mortgagee." Thus, according to the plain language of the waivers and the mortgage, the landlords waived their liens to the extent of the entire $56,000 debt due by Coleman to the Association. The waivers in this case are quite different from those we have considered in some of our other reported cases, a few of which cases are : *Bigham* v. *Cross,* 69 Ark. 581, 65 S. W. 101; *Necley* v. *Phillips,* 70 Ark. 90, 66 S. W. 349; *Griggs* v. *Horton,* 84 Ark. 623, 104 S. W. 930[3]; *Wilson* v. *Bank,* 170 Ark. 1194, 282 S. W. 689[3]; *Burke* v. *Int. L. I. Co.,* 179 Ark. 651, 17 S. W. 2d 314; *Silbernagel* v. *Taliaferro,* 186 Ark. 470, 53 S. W. 2d 999; *Meyer* v. *McKenzie,* 189 Ark. 76, 70 S. W. 2d 505; and *Lee Wilson & Co.* v. *Fleming,* 203 Ark. 417, 156 S. W. 2d 893. When we

[3] Only a memorandum is contained in the Arkansas Reports; the full context appears in the Southwestern Reporter.

compare the waivers here with that involved in *Silbernagel* v. *Taliaferro, supra,* the sweeping extent of the present waivers is made glaringly apparent. The landlords, here, could have limited their waivers, if they had so desired; but they did not. By the plain wording of the waivers, they extend to the entire $56,000 that the Association loaned Coleman. This conclusion is inescapable, since there is no provision to the contrary in the waivers.

II. *The Intentions of the Landlords.* The landlords insist that, in signing the waivers, they did not *intend* to sign such broad and unconditional instruments. They claim that all they intended to do was to waive their liens to the extent of any amounts that the Association might loan Coleman to enable him to make his crops on the lands of these landlords. They offered evidence of the surrounding circumstances to aid the court in determining their intentions. But it is only when the language of the contract is ambiguous that courts look at the surrounding circumstances to ascertain the intentions of the parties. In *Stoops* v. *Bank of Brinkley,* 146 Ark. 127, 225 S. W. 593, Mr. Justice HART, speaking for this Court, said:

"Where the language is clearly susceptible of but one meaning, parol evidence to vary the terms of a written contract is not admissible."

In *Lee Wilson & Co.* v. *Fleming, supra,* in discussing the language in a contract of waiver by a landlord, we said:

"It is . . . well settled that the language of a contract, if not doubtful, is conclusive as to the intention of the parties. *Love* v. *Couch,* 181 Ark. 994, 28 S. W. 2d 1067. . . . This rule applies to rent contracts, such as we have in the present case. *Silbernagel & Company* v. *Taliaferro,* 186 Ark. 470, 53 S. W. 2d 999."

In the case here the language of the waivers is plain and unambiguous; and therefore the evidence as to the intentions of the landlords cannot be used to vary the plain wording of the waivers. Even the rent contracts

prepared by the landlords were almost as broad as the waivers, because—by the contracts—each landlord agreed to sign a waiver ''for the purpose of assisting lessee in procuring a loan.'' It is most probably true that each landlord misunderstood the *legal effect* of the contract and waiver which he signed; but a unilateral misunderstanding of the *legal effect* of an instrument is not a sufficient ground for reformation. *Fullerton* v. *Storthz,* 182 Ark. 751, 33 S. W. 2d 714; *Clark* v. *Trammel,* 208 Ark. 450, 186 S. W. 2d 668; and *Crews* v. *Crews,* 212 Ark. 734, 207 S. W. 2d 606. So we conclude that the clear and unambiguous language of the waivers renders inadmissible the evidence as to what the landlords intended, or thought, the instruments to effectuate.

III. *False Representations by Coleman.* The landlords urge that Coleman represented to them that he did not intend to cultivate his Clay county lands; that, because of this representation, they signed the waivers; that Coleman's representation was false, amounting to fraud, and was factual instead of promissory. Because of this fraud, the landlords insist that they should be allowed to rescind the waivers. The evidence shows that Coleman was guilty of false statements to the landlords, but there is no evidence that the Association knew of such representations, much less participated in them. Coleman personally presented the waivers to the landlords, and then returned the signed waivers to the Association. None of the landlords ever had any conversation with any representative of the Association until the fall of 1944. We recognize the rule to be:

''One who accepts the fruits of fraud, knowing the means by which they were obtained, is liable therefor even though he did not personally participate in the fraud.'' 37 C. J. S. 349.

But in this case the Association made no representations to the landlords, neither did the Association authorize Coleman to represent anything to them, nor did the Association make advances to Coleman knowing that he had misrepresented anything to the landlords. So the above-quoted rule does not apply. The Association

cannot be held liable, here, on the basis of Coleman's fraud, because the Association was ignorant thereof at the time it accepted the waivers and made the advances, and is now seeking to recover only what it so advanced. See *Hardinge* v. *Kuntze,* 278 Pa. 232, 122 At. 509; *Stewart* v. *Mitchell's Admx.,* 301 Ky. 123, 190 S. W. 2d 660; and *Occidental Life Ins. Co.* v. *Minton,* 181 Okla. 298, 73 Pac. 2d 440.

The landlords recovered judgment against Coleman, and as to that angle of the case there has been no appeal. But the landlords failed to prove that the Association— at the time it made the advances to Coleman on the strength of the waivers—had any notice, or reason to suspect, that Coleman had misrepresented anything to the landlords to induce them to sign the waivers. So the landlords' claim for rescission on account of misrepresentation and fraud must fail as against the Association, even if Coleman's statements to them were factual instead of promissory.

IV. *Conversion of the Proceeds of the Crops.* The evidence showed that Coleman converted several hundred dollars of the proceeds of the 1944 rice crop. Because of this conversion, the landlords claim that the Association is liable to them for such amount. But the evidence fails to show that the Association participated in said conversion, or was conscious of it being done. What we said in topic III, *supra,* applies here—*i. e.,* the Association cannot be charged with Coleman's fraud, unless the Association (1) knew or should have known of such fraud, and (2) thereafter received the benefits of such fraud. Nor did the Association participate in the conversion. Such essentials have not been shown. Therefore, our holding in *Walker* v. *Rose,* 153 Ark. 599, 241 S. W. 19 does not apply here.

### Case No. 8427

When the landlords filed their suit, they prayed that they be subrogated to the Association's mortgage on Coleman's chattels, and they filed a *lis pendens* notice describing the chattels. During the pendency of the suit Volentine paid the Association the balance of $16,000 of

the Coleman indebtedness, and took an assignment of the mortgage on the Coleman chattels. Then Volentine took possession of the chattels and sold them. Because of these matters, the landlords appealed from the refusal of the chancery court to award them a personal judgment against Volentine.

As a purchaser *pendente lite,* Volentine stands in the same position in which the Association stood. See § 8959, Pope's Digest; *Whiting* v. *Beebe,* 12 Ark. 421; *Holman* v. *Patterson,* 29 Ark. 357; *Pindall* v. *Trevor,* 30 Ark. 249; *Hobbs* v. *Lenon,* 191 Ark. 509, 87 S. W. 2d 6; *First State Bank* v. *Cook,* 192 Ark. 213, 90 S. W. 2d 510; *Swantz* v. *Pillow,* 50 Ark. 300, 7 S. W. 167, 7 A. S. R. 98. In *Mitchell* v. *Federal Land Bank,* 206 Ark. 253, 174 S. W. 2d 671 we quoted from Corpus Juris:

" ' . . . one who acquires from a party to the proceeding an interest in property, which is at that time involved in a litigation in a court having jurisdiction of the subject matter and of the person of the one from whom the interest is acquired, takes subject to the rights of the parties to the litigation as finally determined by the judgment or decree, and is as conclusively bound by the result of the litigation as if he had been a party thereto from the outset.' "

So, here, Volentine's rights are the same as if the Association had done what he. did.

We have heretofore said—in case No. 8421—that the waivers signed by the landlords extended to the entire $56,000. The Association received $40,000 as proceeds of the rice crops, and had a claim for $16,000 balance against the chattel property. The Association, as a chattel mortgagee, had the right—since the debt was past due—to take possession[4] of the chattels and sell them in accordance with the power of sale in the mortgage. Volentine, as assignee, had the same right, under the wording of the mortgage here involved, that the Association had. The landlords failed to prove that the chattel property was worth more than $16,000, or that Volen-

[4] For cases recognizing this to be true, see West's Arkansas Digest, Chattel Mortgages, § 162; see, also, Hughes on Arkansas Mortgages, § 320.

tine received more than that amount from the property. In short, they failed to show any corruption or unfair dealings by Volentine in disposing of the mortgaged chattels, so they made no case against him. Therefore, the chancery court was correct in refusing to render judgment against Volentine.

### Conclusion

The effect of this opinion in Case No. 8421 is to hold: (1) that the waivers were absolute and unconditional, and extended to the entire $56,000 loaned by the Association to Coleman; (2) that until such amount was repaid, the landlords were entitled to no part of the proceeds of the crops; and (3) that the proof did not show that the Association received more than its debt. So we reverse the decree of the chancery court insofar as it rendered money judgments in favor of the landlords against the Association, and remand the cause to the chancery court with directions to enter a decree in keeping with this opinion.

The effect of this opinion in Case No. 8427 is to affirm the decree of the chancery court in denying the landlords a judgment against Volentine. All costs are assessed against the landlords.