ANDREW J. GREEN AND DORIS F. GREEN v. MACK C. OWENS, JR.

73-41                                    495 S.W. 2d 166

Opinion delivered May 28, 1973
[Rehearing denied June 25, 1973.]

*Paul K. Roberts,* for appellants.

*Ronald L. Griggs* and *Camp & Thornton, P.A.,* for appellee.

JOHN A. FOGLEMAN, Justice. Appellants contend that the chancery court erred in refusing to decree foreclosure of their agreement for the sale of a newspaper. The chancery court denied this relief upon a holding that appellants had released appellee from any and all responsibility under the agreement. Even though there is considerable conflict in the evidence as to the tenor and effect of conversations and conduct of the parties, we affirm because we are unable to say that this finding was clearly against the preponderance of the evidence.

Appellants were the owners of two newspapers as partners. They combined the two into one publication called "Calhoun Herald and Arkansaw Plain Dealer." They sold it on July 10, 1964, to J. W. and Marilyn Lindsey for $10,000, retaining a lien for $8,000 deferred purchase price, payable in monthly installments of $50 each, with interest at 6% per annum. The sale included all printing equipment and other personal property used in the publication of the paper. A seller's lien was retained by appellants. On July 14, 1965, the Lindseys sold the newspaper to appellee Mack C. Owens. Part of the consideration for the sale was Owens' agreement to assume the $7,887.14 balance of the purchase price the Lindseys owed appellants. The contract between the Greens and the Lindseys prohibited a sale or assignment without written consent of appellants, but consent to the sale to Owens was given. Owens continued the operation of the newspaper and made payments on the indebtedness until December 15, 1966, at which time the unpaid balance on the contract of sale amounted to $7,722.60. Appellee defended upon the ground that he had been released from his obligation to pay the balance due on the purchase price and that all the equipment covered by the agreement had been returned to appellants.

It was admitted by appellant Andrew Green that appellee was threatening to cease publication of the newspaper after making a payment about December 15, 1966, and that he asked appellee to keep it going. Owens advised Andrew Green at the time by telephone that the newspaper was not profitable. Owens testified that he told Green in the spring of 1967 that he could not make a go of the newspaper and was trying to find someone to take

over the purchase agreement. He said that Green told him to forget about the notes and continue publication until Green could get someone to take the newspaper off his hands and promised Owens $2,500 if he would do so. Owens states that Green remarked that it was necessary that the status of the paper as a "legal publication" be maintained until a buyer was found. According to Owens, Green later stated that he had advertised the paper for sale and that he would pay Owens a commission to sell it. Green admitted that he advertised the paper for sale in the Trade Journal during 1967 and 1968, pricing it at $11,000 and that he would have paid Owens a commission for arranging a sale which avoided the necessity of Green's returning to Arkansas from Orange, Virginia, where he had resided since the sale to the Lindseys. He also admitted that continued operation of the newspaper was essential to its sale and that Owens kept it going.

At some time following his conversation with Green, Owens left Hampton, where the newspaper was published, and accepted employment in Tyler, Texas, leaving his brother Buddy Owens and the brother's wife Nell Owens in charge of the newspaper, the publication of which was continued until April 10, 1969. In September 1967, Owens had contracted for the purchase of "offset" printing equipment. The reason for changing to this equipment, according to appellee, was his inability to employ persons experienced in the use of the original equipment. The equipment formerly used in the printing of the newspaper was called hot press or hot-type equipment, and the offset equipment was referred to as cold-type equipment. Owens said he also moved the operation to another location because there was not sufficient room for the offset equipment, but took nothing from the old building except a typewriter and an enlarger.

Thereafter, Green entered into an agreement with one Haynie for the sale of the newspaper. Haynie sent $100 to Green at Orange, Virginia, as earnest money to evidence his interest, and an agreement for the sale was made after Green came to Hampton in August 1968. Haynie then paid Green an additional $500. Green could not recall the terms of the sale and referred questions about it to

Haynie. He did ask Buddy and Nell Owens to stay and assist Haynie, and they agreed to continue as employees of Haynie. Green considered the transaction complete and unconditional, except for preparation of a written contract, and returned to his home in Virginia and did not return to Hampton until January 1971. He then found that appellee was working in Tyler, Texas. In the intervening period, Mack Owens had been advised of the sale by both Green and Haynie, but when Haynie did not take over the operation, Owens gave up his employment in Texas in October 1968 and returned to Hampton and took charge of the newspaper. Green refunded the money paid him by Haynie on December 5, 1969. He said that he did not make the refund earlier because Haynie had not requested it. The testimony as to the reason Haynie did not complete the transaction is in hopeless conflict and confusion. Green contends that Owens refused to turn the plant over to Haynie, and Owens denies this. Green relied upon letters from Haynie in arriving at his conclusion, but did not produce them. He said that he was not sure what was going on in Hampton and did not even receive copies of the newspaper. Owens claimed that when he tried to find out when Haynie was to take over, he was unable to communicate with Green, and that he heard nothing from Green between October 1968 and December 1971. He said that he returned to Hampton and continued the operation because he could find no one to take over.

Green admitted having written appellee in April 1968, authorizing appellee to discount a proposed selling price of $9,000 if necessary for a quick sale, and agreeing that, on a cash sale, appellee should receive one-third of the purchase price, "free and clear," from Green. If, however, Green had to "finance" a sale, he said, the price was to be $9,000, $2,250 of which was to be paid in cash with monthly payments of at least $60 on the balance. Under the latter arrangement, Owens was to receive one-half the down payment as "get-away money," and a balance depending upon the purchaser's record of payments. Under either arrangement, the net amount to be received by appellants from the new purchaser would have been considerably less than the amount due from appellee. The clear implication of the letter is that Owens would be

relieved of his debt to appellants, at least when such a sale was made.

At the time of the alleged sale to Haynie, Green must have known of Owens' removal of the operation to a new location, because he testified about having gone to the old plant in July 1968 for the purpose of cleaning up the equipment. Owens testified that Green had never demanded payment of the indebtedness.

Haynie testified that there was never a firm contract for his purchase of the newspaper because he could never get Green and Owens to agree on a price and never could get possession. After the transaction with Green, Haynie and his wife went to the old plant preparing to clean it up, but Haynie said he was advised by Owens that he was intruding. Haynie knew, when he made his $500 payment to Green, that no newspaper could be published without the old equipment being repaired. Green's testimony seems to clearly indicate that only the "hot-type" equipment was inspected and discussed during his negotiations with Haynie. Haynie also stated that his agreement was to take this equipment, and that he did not know how to operate the offset equipment. Yet Haynie attributed his failure to complete the purchase to his learning that Owens expected him to buy the new equipment. Haynie said that Owens made this additional purchase a condition for surrender of possession of the newspaper. He admitted that Owens never did anything to discourage him from purchasing the newspaper, except to come to the old plant and point out the equipment Haynie was supposed to be buying.

Owens' version was somewhat different. He said that the subscription list and equipment which Haynie had purchased would have been delivered upon Haynie's request, and that he returned to Hampton because he never heard from Haynie, although he had asked to be advised when Haynie was ready to take over the newspaper. According to Owens, the conversation about the offset equipment consisted only of his answer that he was going to sell it and would have to get the $6,000 he owed on it, when Haynie asked what he was going to do with it.

We are unable to say that the finding that appellee was released from his obligations on the contract of purchase is not supported by a preponderance of the evidence. We certainly are unable to say that the chancellor's finding that appellants had accepted re-delivery of the property purchased from them by appellee, had exercised dominion and control over it and had at least attempted to sell it was clearly against the preponderance of the evidence. These facts are certainly corroborative of the evidence of a specific release by Green, who was clearly authorized to act for the appellants. A release is a contract requiring consideration. *Hayes* v. *McGuirk*, 188 Ark. 1167, 66 S.W. 2d 281; *Golf Shaft & Block Co.* v. *O'Keefe*, 200 Ark. 529, 139 S.W. 2d 691. Owens' agreement to continue the operation of the unprofitable newspaper to prevent loss of its value after he had decided that he was unable to continue to publish it was sufficient consideration to support a release by Green. The contract of sale did not obligate Owens to continue publication, and he had a legal right to abandon it and follow the employment he had secured in Texas. His forbearance of this right at Green's instance and his performance of an act he was not obligated to do were adequate consideration for a release. The waiver of a legal right or forbearance to exercise it is sufficient consideration for a release made because of the waiver or forbearance. 76 C.J.S. 637, Release § 16; 17 Am. Jur. 2d 441, Contracts § 97, 470, § 124. See *Gage* v. *Blount*, 161 Ark. 238, 255 S.W. 879.

We recognize that there is evidence contrary to the chancellor's finding. Appellants rely heavily upon the fact that appellee continued to publish a newspaper in Hampton which he called "Southern Arkansas Accent." The first issue of this publication appeared on April 17, 1969, was mailed to all Herald and Plaindealer subscribers, and appellee published legal notices therein in spite of a requirement that, to be eligible, the newspaper must have been published regularly for at least 12 months or be the legal successor of such a publication. It might well have been said that the new publication was a continuation of the old. In the meantime, however, according to Owens, both Green and Haynie had said the former newspaper had been sold to Haynie, and he had not been

advised when Haynie would take over or of any reason why he did not. The conflicts in the various versions of events, after Owens told Green in early 1967 that he could no longer continue publication, raise questions of credibility on which we must defer to some extent to the superior perspective of the chancellor.

We are unable to agree with appellants' argument that a stipulation between the parties during the course of the trial constituted an acknowledgment by appellee that he had not been released. The chancellor took that stipulation simply as an agreement that the amounts stated by appellants as the balance remaining unpaid after appellee's last payment and the interest accrued thereon were correctly stated, if indeed, appellee owed the debt to appellants. This relieved appellants of further proof of these amounts. There was nothing in the stipulation to indicate an abandonment of appellee's principal defense, i.e., that appellants had released him from any obligation.

Since we are unable to say that the chancellor's holding is clearly against the preponderance of the evidence, the decree is affirmed.