Donald M. FITZWATER and Barbara Fitzwater, Plaintiffs,

v.

LAMBERT AND BARR, INC. and Wausau Insurance Companies, Defendants.

Civ. No. 81–4076.

United States District Court,
W. D. Arkansas,
Texarkana Division.

May 7, 1982.

E. Ben Franks, Arnold, Lavender, Rochelle, Barnette & Franks, Texarkana, Ark., for plaintiffs.

Marshall H. Moore, Dowd, Harrelson & Moore, Texarkana, Ark., for defendants.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

### Introduction

This action was brought by plaintiffs, Donald M. Fitzwater and his wife, Barbara Fitzwater, pursuant to 28 U.S.C. § 1332, based upon complete diversity of citizenship, arising from an automobile accident which occurred on U. S. Highway 82 near Stamps, Arkansas. Plaintiffs assert that the negligence of Arvie Johnson, an employee of Lambert and Barr, Inc., was the proximate cause of the collision, and that Lambert and Barr, Inc., is therefore liable by virtue of *respondeat superior.*

Defendants moved this Court for summary judgment in November of 1981, and filed an amended motion in March of 1982. Plaintiffs have timely responded and the issues are ripe for resolution.

### Findings of Fact

1. Plaintiff, Donald M. Fitzwater is a citizen and resident of Bowie County, Texas. Plaintiff, Barbara Fitzwater, is the lawful wife of Donald Fitzwater and resides with him in Bowie County, Texas.

2. On July 30, 1979, Donald Fitzwater was involved in an automobile accident on U. S. Highway 82 near Stamps, Arkansas. Plaintiffs allege that their vehicle was struck from the rear by a vehicle driven by Arvie Johnson. Plaintiffs allege that Arvie Johnson was acting in the course and scope of his employment with the defendant, Lambert and Barr, Inc.

3. Mr. Fitzwater was approached by an insurance adjuster on August 22, 1979, at which time Mr. Fitzwater executed a release, which purported to be in full settlement of any claim he may have against Arvie Johnson and Lambert and Barr, Inc. Mrs. Fitzwater did not sign because of her concern for possible repercussions from the accident, unknown at that time.

4. On October 3, 1979, after Mr. Fitzwater had been observed by his family physician, both Mr. and Mrs. Fitzwater executed a second release. This release was in consideration of $1,756.50, for medical expenses and property damage, and released Arvie Johnson and Lambert and Barr, Inc. from any claims arising from the vehicular accident, known and unknown. The release unambiguously stated that the nature, extent, and duration of the injuries were not known at that time. Plaintiffs wrote on the release that they read it prior to signing it and understood that it settled everything.

5. On June 17, 1981, plaintiffs instituted this action, alleging that the release was ineffective because of fraud, duress, undue influence, mistake, lack of capacity, and failure of consideration. Defendants answered affirmatively raising the defense of release and settlement.

6. In November of 1981, defendants moved for summary judgment. In support of their motion defendants submitted the pleadings, depositions of the plaintiffs and the exhibits thereto. In February, plaintiffs responded, asserting that Donald Fitzwater was mentally incapacitated to the point that the release was void. Plaintiffs offered the pleadings, the plaintiffs' depositions, and the affidavit of Dr. Murray Day.

7. In March of 1982 the defendants filed an amended motion for summary judgment, proffering the deposition of Dr. Day in support. Plaintiffs responded, proffering the same deposition.

8. The Court finds that the plaintiff, Donald Fitzwater, suffers from low-grade hydrocephalus, caused at least partially by the accident of July 30, 1979. Because of the nature of the injuries there was a considerable delay in the appearance of the symptoms.

9. Donald Fitzwater is a high school graduate with some college and experience in the oil business. The Court finds that there is no genuine issue of fact presented with respect to Donald Fitzwater's legal incapacity to sign the releases. There is no evidence that Donald Fitzwater was generally incapable of executing legal documents, and there is no evidence that Donald Fitzwater was mentally incapacitated on August 22, 1979 or October 3, 1979 to the point that he was unable to understand the nature of his actions and their consequences. The Court finds that there is not the "slightest doubt" as to the plaintiffs' mental capacity presented. The Court finds that Donald Fitzwater and Barbara Fitzwater did not lack the legal capacity to contract on the dates in question. The evidence is not such that any other conclusion is possible.

10. The Court finds that there is no evidence that any circumstances constituting fraud surrounded the execution of the releases. There is no genuine issue of fact presented, and the evidence is not such that any other conclusion is possible.

11. The Court finds that no menacing or threatening circumstances such as to excite the reasonable apprehensions of a person of ordinary courage were present during the execution of either release. Nor, therefore, were the releases executed under the influence of same. There is no genuine issue of fact presented, and the evidence is not such that any other conclusion is possible.

12. The Court finds that Barbara Fitzwater, Donald Fitzwater and Wausau Insurance Companies fully understood the terms and effects of the releases. There is no genuine issue of fact presented, and the evidence is not such that any other conclusion is possible. Nor is there any evidence of fraud, misrepresentation or other inequitable conduct on the part of either defendant. There is no genuine issue of fact presented, and the evidence is not such as will admit of the slightest doubt that a material factual issue is not presented.

13. The Court finds that the insurer paid the plaintiffs the sum of $1,746.50, as compensation for both medical expenses and property damage. Viewed in the light of circumstances existing as of the time of the execution of the releases, this sum was not, as a matter of law, so grossly inadequate as to constitute a failure of consideration. No other pertinent circumstances surrounded the execution of the releases. There is no genuine issue of material fact presented, and the evidence is not such that any other conclusion is possible.

14. The releases were executed under such circumstances that the effects of same cannot be avoided. The Court finds that there is not the slightest doubt that a genuine issue of fact concerning the validity of the releases is presented.

## Discussion

This cause arises under 28 U.S.C. § 1332 for injuries sustained by plaintiff, Donald M. Fitzwater, a citizen and resident of Bowie County, Texas, in an automobile accident which occurred on July 30, 1979, on U. S. Highway 82, in Arkansas. Plaintiff alleges that his vehicle was struck from the rear by a vehicle driven by one Arvie Johnson, in the course and scope of Mr. Johnson's em-

ployment with the defendant, Lambert and Barr, Inc.

Plaintiff allegedly suffered severe injuries as a result of the negligence of Arvie Johnson, which negligence is allegedly imputable to the defendant, Lambert and Barr, Inc., by virtue of *respondeat superior.*

Subsequently, Mr. Fitzwater executed a release on August 22, 1979, which purported to be a full settlement of the plaintiff's claim. Mrs. Fitzwater did not sign, because she "wanted to know if (Mr. Fitzwater) had any repercussions, possible repercussions from the accident." On October 3, 1979, after Mr. Fitzwater had been observed by his family physician, the plaintiffs executed a second release. The releases were presented to the plaintiffs by an insurance adjuster, employed by defendant Wausau Insurance Companies. So far as can be ascertained the releases were identical with respect to their effects, although as noted, Barbara Fitzwater did not sign the initial release, and the handwritten portions of each may have differed.

The October 3, 1979 release provides in pertinent part:

We for and in consideration of the sum of Seventeen Hundred and Forty Six and 50/100 Dollars ($1746 50/xx) to us paid, ... do hereby ... fully and forever release and discharge ... Lambert and Barr Incorporated and Arvie Johnson ... from any and all claims and demands, actions and causes of action, damages, claims for injuries, both known and unknown, including future developments thereof, ... or in any way growing out of, any and all known and unknown personal injuries including death resulting therefrom....

.    .    .    .    .

We agree that this settlement is in full compromise of such injuries and damages and that the payment is not to be construed as an admission of liability. We further agree that the nature, extent and results of the injuries or damages sustained by me (us) are not now all known or anticipated, but we nevertheless desire to settle and compromise said claim in full.

.    .    .    .    .

We have read the above release ourselves before signing it and understand that it settles everything.
/s/    Donald Fitzwater
/s/    Barbara Fitzwater
(Underlined portions are handwritten)

On June 17, 1981, plaintiffs brought this action against defendants Lambert and Barr, Inc. and Wausau Insurance Companies, alleging that plaintiffs' claims were not barred by the release because of fraud, duress and undue influence, mutual mistake, lack of capacity, and want of consideration. Defendants responded, raising affirmatively the defense of release and satisfaction, generally denying that the release was executed under circumstances of fraud, duress, mistake, incapacity, and failure of consideration.

In November of 1981, defendants moved for summary judgment on the ground "that there is no genuine issue of material fact and that the Defendants are entitled to judgment as a matter of law." In support of their motion, defendants submitted the pleadings, depositions of the plaintiffs and the exhibits attached thereto.

On February 5, 1982, plaintiffs responded asserting that Donald Fitzwater was "mentally incapable of understanding and executing the two releases which are relied upon by the Defendants herein as providing a complete defense to this action." Donald Fitzwater's mental condition, plaintiff asserts, "involves a question of fact ... and the plaintiffs are entitled to a trial." In support, plaintiffs offer the pleadings, the plaintiffs' depositions, and the affidavit of Dr. J. Murray Day.

Subsequently, in March of 1982, the defendants filed an amended motion for summary judgment, proffering the deposition of Dr. J. Murray Day in addition to the material submitted earlier.

Plaintiffs responded on March 30, 1982, also submitting the deposition of Dr. J. Murray Day along with the previously offered material.

At the outset it is noted that both parties have fully briefed the legal and factual issues presented, and are to be commended for their thoroughness and assistance to the Court.

In narrowing the issues, the language of the rule is most beneficial. Rule 56(e) provides:

... when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial....

Fed.R.Civ.Pro. 56(e).

Plaintiffs' response to defendants' motion for summary judgment relies primarily upon the affidavit of Dr. J. Murray Day, to the effect that Mr. Fitzwater may have lacked the capacity to understand the nature of the releases signed. Dr. Day's affidavit provides in pertinent part:

6. Further, on August 22, 1979, and again on October 3, 1979, when Donald M. Fitzwater executed the two separate Releases and Settlement of all claims, it is my opinion, based upon reasonable medical probability, that Donald M. Fitzwater was very likely to have been mentally incapable of understanding and executing the releases.

/s/ Dr. J. Murray Day

Dr. Day's conclusion is based upon his diagnosis that Donald Fitzwater suffers from low-grade hydrocephalus, caused, in his opinion, by the accident of which plaintiffs complain.

After the auto accident on July 30, 1979, Mr. Fitzwater had no apparent long-lasting injuries. (Depo.—Donald Fitzwater, p. 10). Subsequently, he began experiencing a loss of equilibrium, trouble with his vision and unsteadiness in his legs. (Depo.—Donald Fitzwater, pp. 51 and 58; Defendants' Exhibit 3 to depo. of Donald Fitzwater). According to the statements of Dr. Day, the delay in the appearance of Mr. Fitzwater's symptoms is explained by the occipital lobe infarct being on a contusion basis. Blood was extruded into the subarachnoid space and conceivably blocking off the arachnoid villi producing extremely low grade hydrocephalus. (Depo.—Dr. Day, pp. 8–16).

Plaintiffs rely upon the testimony of Mrs. Fitzwater, to the effect that Mr. Fitzwater was "dazed" after the accident. In her deposition she stated:

A. He did not walk like he ordinarily does, he did not speak as he ordinarily does.

. . . . .

A. He could not answer all the questions that I tried to find out about the accident. He was sort of vague.

(Depo.—Barbara Fitzwater, p. 7).

Plaintiffs assert that the deposition testimony of Mrs. Fitzwater and Dr. Day demonstrate the existence of a genuine issue of fact.

Defendants note that Mr. Fitzwater admitted in his deposition that he was a high school graduate and had had some college courses. Since that time he had been in the oil business. Defendants argue that the release is plain and unambiguous and that the plaintiffs specifically stated that they understood the release. Mr. Fitzwater stated that he "felt good" when he signed the release.

Between the times of the signing of the two releases, Mr. Fitzwater was observed by his family physician. After being advised by the family physician, both Mr. and Mrs. Fitzwater signed the second release.

Mrs. Fitzwater stated that her understanding of the release was, "that if I signed it, that the case would be closed...." Further:

Q. And you understood what the release said, did you not.

A. I understood.

(Depo.—Mrs. Fitzwater, pp. 11, 27).

Mr. Fitzwater likewise testified by deposition that:

Q. Was there any question in your mind as to what the release meant or what it stood for?

A. Not at that time.

. . . . .

Q. And it states in effect that this release is in settlement for both the property damage and any personal injury that may be known at that time or unknown at that time, that is what the release stated as you read it.

A. That is what I am talking about now, it was unknown at that time.

Q. Well, yes, sir, I understand that but that is what the release said, and you read it and you understood it at that time?

A. That is right.

(Depo.—Donald Fitzwater, p. 43).

As both parties rely heavily on the opinion of Dr. Day, his deposition testimony must be carefully scrutinized. Dr. Day testified as follows:

Q. And how did you come about seeing Mr. Fitzwater?

A. He was referred to me by Doctor Alston.

Q. All right, sir. Did you take a history upon initial examination, a history from him?

A. Yes.

Q. And what did that history reveal?

A. He was, for the last six months, he had been having some ataxia and lightheadedness. This had been slightly progressive. There had been no slowing in mentation. Recently he went to Scott & White where a normal EMG was done, and correction, where an EMI scan was taken, and the patient—this revealed hydrocephalus. He was closely questioned in regard to this, and the only positive symptoms I could come up with is the presence of an unsteady gait over the past several months. He has had some visual disturbance as well that have not responded to new glasses.

A history of being involved in an automobile accident one year ago. At that time he was not rendered unconscious. A nucleotide scan was done at Wadley Hospital at this time the results of which are unknown.

Past history of diabetes. Takes insulin. History of hernia repair. Changes in mentation. He was slightly forgetful, and there is some slowing of mentation, but this is marginal and probably could be accounted for by age alone.

On examination, he appeared to be quite alert; speech normal; gait somewhat slow, wide based. Does not sway on Romberg testing.

Further examination reveals a right homonymous hemic quadrantanopsia. Discs are sharp. Remaining cranial nerves are intact. Blood pressure 160/100. In the extremities, no sensory, motor, or reflex abnormalities noted.

Diffuse slowing on the left side by virtue of his EEG obtained at Scott & White. I felt—my impression was that he may have a low pressure hydrocephalus rather than the hydrocephalus ex vacuo. Quadrantanopsia could possibly be explained by the occipital lobe contusion at the time of the automobile accident.

I explained to the family the only way of detecting an active hydrocephalus would be by a serial IQ testing. And nonetheless, there is a reasonable suspicion this process is active. I am repeating his CT Scan and will again meet with the patient. I have explained that quite often a shunt is done and does not seem to help, but if it does not help it does not hurt. And so that was my first contact.

(Depo.—pp. 5–7).

Q. All right, Sir. And also I believe you stated that he had a low grade hydrocephalus?

A. Yes.

Q. I assume that would be as opposed to a high grade hydrocephalus?

A. Yes.

Q. And it would not be as severe?

A. Oh, yes, it's quite as severe, except that it is more slow acting. The end result is the same, namely, destruction of the brain, except that in a high grade hydrocephalus you can get, be-

fore destruction of the brain even occurs, you can get herniation of the brain and death as a result of it.

Q. Well, when would the occurrence of either—what would be the difference of occurrence, say, time limit wise?

A. I can't say that. But we are talking about weeks for the acute, and months, many, many months, maybe a year or more, for the low grade.

Q. Could it be more than a year?

A. Yes.

Q. Could it be three years?

A. It could be.

Q. Could it be five years?

A. I don't know that.

Q. Is it possible?

A. Yes, I guess it could be possible. I've never heard of a case, though, of five years duration.

Q. Was there any problem between you and Mr. Fitzwater on your initial examination with communication? Did you have any problem communicating with him?

A. No.

Q. Was he alert in orientation as to time and place and person?

A. Yes, he seemed to be fairly alert. He was somewhat slow, but he was quite clear. He's a man of substantial education, and thereby, yes, it was quite good.

Q. Coherent?

A. Yes.

(Depo.—pp. 9–11).

.    .    .    .    .

Q. All right, sir. Assume Mr. Fitzwater had had previous head injuries. I'm not giving you any time limit as to when they have occurred. Just assume that he did have those head injuries. Would it not be possible, say, three years prior to when you saw him, would it not have been possible that this medical condition could have resulted from this head injury rather than the accident that we are speaking of?

A. I can't assume that in the absence of a history that had been given.

Q. I understand that. But assume that history was given to you that he had had several head injury episodes?

A. Yes, it could take two or three years for something like this to build up.

(Depo.—p. 13).

.    .    .    .    .

Q. Does a person who has hydrocephalus lose his ability to reason or to think?

A. No, it's blunted. They don't lose it . . .

Q. Well, if it's a low grade . . .

A. . . . until far—until the disease is very far progressed and then they become amented.

Q. How long would that take before they become . . .

A. It can take years, as I say.

Q. Say someone had an accident, a head injury, and it eventually turned into hydrocephalus. What would his condition be, his mental state be, say, two or three months after that? Would it be to such a deteriorated state that he would not understand the normal affairs of the world?

A. I doubt that. It's usually a slow acting thing, which is why I say it's defined as low pressure hydrocephalus.

Q. All right, sir. Would it take, and you may have already answered it, would it take a year or more to become very severe, to such a degree that he couldn't understand what he was doing?

A. Well, it depends on whether following the head injury it became an acute hydrocephalus or a low grade hydrocephalus. If it was an acute hydrocephalus, it could all happen within a matter of days or weeks . . .

Q. Right.

A. . . . but they would go downhill and become very obtuned. But the low grade hydrocephalus by definition, is a slow acting, long-term thing.

(Depo.—pp. 15–16).

.    .    .    .    .

Q. Well, let me understand you. In most situations if a person becomes, as a result of the hydrocephalus, becomes unable to understand, it normally wouldn't occur, if it's low grade, it normally wouldn't occur two or three or four months after the accident?

A. Normally, no.

(Depo.—p. 17).

. . . . .

Q. All right. Assume that this man who you've already stated was an intelligent man, had an accident on July 30, 1979, and he signed a release document releasing the Defendants, who I am representing, from any liability, any and all liability, and this document was signed on October 3, 1979, approximately two and a half or three months after the accident. In that situation, after your stating that it takes months, would he, in your opinion, be able to understand a form document? Or better yet, let me give you the document?

A. Well, I don't think that's necessary because I wasn't there and I did not see the patient then, and I have no idea what his mental status was, or his ability. And the only thing I can say is had I known the patient before he had any accident whatsoever, had I had an IQ test on him, and so in the two or three times comparing each one, only then would I be able to say whether he was mentally competent to make that judgment at that time.

Q. So you are stating that you weren't there and you wouldn't know his mental state at the time that he signed those releases?

A. That's correct.

Q. All right, sir. In the Affidavit, Paragraph No. 6, you state: "That further, on August 22, 1979, and again on October 3, 1979, when Donald M. Fitzwater executed the two separate releases in settlement of all claims, it is my opinion, based upon reasonable medical probability, that Donald M. Fitzwater was very likely to have been mentally incapable of understanding and execu-

ting the releases." How do you jive that statement with what you just got through saying?

A. Well, this is an opinion. But the opinion is different from the fact. As I told you before, the only way I could say with certainty what his mental ability was at that time is to have had an IQ testing him before the injury, at the time of the execution, and one at the time that I saw him.

Q. The follows up my next question. Can you state within a reasonable degree of medical certainty that Mr. Fitzwater was unable to understand the releases that he executed?

A. No, because I wasn't there at the time. I didn't even know the patient.

(Depo.—pp. 23–25).

. . . . .

Q. Doctor, I believe you have given us your opinion here and also in your Affidavit that based upon reasonable medical probability Mr. Fitzwater was very unlikely to have been mentally incapable of understanding and executing the releases within several months after his accident?

A. As I said before, that's a surmise. The only way I would be able to say that as a positive statement is if I had a yardstick to go by. I did not have that yardstick, and therefore it must be considered in that light.

Q. It's an opinion based upon your medical training and the history given, is that correct?

A. It was within three months of the accident? I'm—I don't know. As I say, I'd never met the man until a year or so after that time. I have no idea what the condition was. The only way I could do it quantitatively would be to have those tests that I've mentioned. Otherwise, it's a surmise.

(Depo.—p. 41).

Thus, the sum and substance of Dr. Day's testimony is that it would be quite rare indeed for an individual to become mentally incapable of normal understanding within

two to three months from the onset of hydrocephalus of the low-grade type. Dr. Day can point to no facts from which his opinion follows. Dr. Day repeatedly declared that he has no real knowledge whatsoever as to Mr. Fitzwater's mental condition on the dates of the two releases. Viewed in the light most favorable to plaintiffs, Dr. Day's opinion as to Mr. Fitzwater's mental condition rises no farther than mere conjecture, speculation, or "surmise."

■ Under Arkansas law, a release of damages for personal injuries may be disregarded where plaintiff's mental or physical condition is such that he could not appreciate the character of the instrument and the consequences of executing it. *St. Louis, I. M. & S. Ry. Co. v. Bearden*, 107 Ark. 363, 155 S.W. 499 (1913).

As stated in C.J.S.:

In order to render a release void on this ground, it should appear that the releasor did not possess at the time of the execution of the release sufficient understanding to know the nature of the act and its effect . . .

76 C.J.S. Release § 23, p. 642.

■ The evidence is undisputed that the plaintiffs read the release. It is beyond question that plaintiffs knew the character of the release and understood the consequences of executing it. The release is clear, plain, simple, and unambiguous in all respects. It may indeed be true that plaintiffs failed to appreciate the seriousness of the injury, but startlingly clear hindsight will not render the acts of one laboring under erroneous foresight void *ab initio*. *St. Paul & Marine Ins. Co. v. Hundley*, 354 F.Supp. 655 (E.D.Ark.1973). That plaintiffs' signing of the release was perhaps unwise, and in retrospect unfortunate, is not sufficient to avoid it.

■ Plaintiffs correctly note that a summary judgment under Rule 56 is an extreme remedy which should be sparingly employed. Any doubt as to whether there is an issue of material fact for trial should be resolved against the moving party. *Williams v. Chick*, 373 F.2d 330 (8th Cir. 1967).

The language of *Ford v. Luria Steel and Lumber Corp.*, 192 F.2d 880 (8th Cir. 1951) is most helpful:

A surmise or belief, no matter how reasonably entertained, that a party cannot prevail upon a trial, will not justify refusing him his day in Court with respect to material issues which are not clearly shown to be sham, frivolous, or so unsubstantial that it would be obviously futile to try them . . . .

■ The summary judgment procedure is well adapted to expose sham claims. *Caylor v. Virden*, 217 F.2d 739 (8th Cir. 1955); Wright & Miller, Federal Practice and Procedure, § 2712. In the kind of case defined by Rule 56, where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, "summary judgments are looked upon with favor." *Freeman v. Continental Gin Co.*, 381 F.2d 459 (5th Cir. 1967).

In the instant case, it is not that the alleged factual dispute is not material, for it is potentially dispositive. The alleged factual dispute present here is simply not genuine.

■ To determine the existence of a genuine issue, the Court must engage in a rather sophisticated and careful inquiry. Nevertheless, the inquiry must be made if the Rule 56 procedure is to accomplish its objective—to pierce the allegations of the pleadings. Wright & Miller, Fed.Prac. & Proc., § 2725, p. 508. Therefore, if the evidence presented on the motion is subject to conflicting interpretations, or reasonable men might differ as to its significance, summary judgment is improper. *Chenette v. Trustees of Iowa College*, 431 F.2d 49, 53 (8th Cir. 1970).

■ Although the material offered in support or opposition to a motion for summary judgment may not be employed to resolve disputed factual issues, they may be used to determine whether any issues are in dispute. *U. S. ex rel Jones v. Rundle*, 453 F.2d 147 (3rd Cir. 1971); *Carter v. Williams*, 361 F.2d 189 (7th Cir. 1966).

■ The general rule is that, in the absence of proof to the contrary, every person is presumed mentally competent. 29 Am. Jur.2d *Evidence* § 202, p. 255; 31A C.J.S. *Evidence* § 147.

■ In the instant case, defendants have the burden of demonstrating that there is no genuine factual dispute as to Mr. Fitzwater's mental capacity at the time of the signing of the two releases. Plaintiffs need only point out sufficient facts from which a material fact can be considered questionable. However, in this regard, as far as Mr. Fitzwater is concerned, there must appear to be a genuine question concerning Mr. Fitzwater's capacity on *both* August 22, 1979, and October 3, 1979, the dates of the two releases, before a summary judgment would be improper on this issue. So long as there is no genuine question concerning one of the releases, then summary judgment would be proper.

As Dr. Day stated:

As I say, I'd never met the man until a year or so after that time. I have no idea what the condition was. The only way I could do it quantitatively would be to have those tests that I've mentioned. Otherwise, its a surmise.

(Depo.—Dr. Day, p. 41).

Every shred of evidence submitted shows that Mr. Fitzwater had the capacity to contract on at least one of the days in question. This is opposed by plaintiffs, not with proof, but with conjecture. This Court is of the opinion that no genuine issue of fact is raised by Dr. Day's *surmise*, in view of the *facts* to which he testified.

Many courts appear to make the Rule 56(c) determination on a case by case basis, without following any prescribed formula. However, several courts have attempted to enunciate a judicial standard for granting summary judgment. These courts have held that a genuine issue exists, thereby precluding summary judgment, as long as the "slightest doubt" remains as to the facts. Wright & Miller, *supra*, § 2725, p. 508, citing *Clausen & Sons, Inc. v. Theo Hamm Brewing Co.*, 395 F.2d 388 (8th Cir. 1968); *Armco Steel Corp. v. Realty Inv. Co.*,

273 F.2d 483 (8th Cir. 1960), *et al.* Thus, this seems to be the approach utilized by the Eighth Circuit in the past. However, as Wright & Miller note, this is

in fact merely a gloss on the words "genuine issue" found in Rule 56(c). Furthermore, it is misleading and, strictly speaking, incorrect. A better and more accurate formulation than the "slightest doubt" test is that the party opposing a summary judgment motion is to be given the benefit of all reasonable doubts and inferences in determining whether a genuine issue exists that justifies proceeding to trial. It should be noted that this is the approach most courts actually take and that the "slightest doubt" standard, once the rallying cry of those judges who took a restrictive approach to summary judgment procedure, has been employed with decreasing frequency over the past few years.

Wright & Miller, supra, § 2725, p. 510. Cf. *Chalfant v. Wilmington Institute*, 574 F.2d 739, 759 (3rd Cir. 1978); *Goclowski v. Penn. Cent. Transp. Co.*, 571 F.2d 747, 751 (3rd Cir. 1977).

However, this Court has no hesitancy in finding that under either view, the modern test or the "slightest doubt" test, there is no genuine issue of fact presented with respect to Mr. Fitzwater's legal capacity to contract on the dates in question.

Likewise, there is no proof or inference remotely indicating that Mrs. Fitzwater lacked legal capacity to enter into the October 3, 1979 release. Consequently there is no genuine issue presented as to her capacity, and summary judgment with respect to Mrs. Fitzwater on this issue is therefore appropriate.

Plaintiffs have raised certain other issues in attempted avoidance of the releases. These are fraud, duress and undue influence, mistake, and lack of consideration. These contentions will be discussed briefly in that order.

■ It is of course true that under Arkansas law, fraud may be shown to set aside a release. *Creswell v. Keith*, 233 Ark.

407, 344 S.W.2d 854 (1961). However, as defendants correctly point out, no actual attempt has been made to prove fraud. As stated in *Hutcheson v. Frito-Lay, Inc.*, 204 F.Supp. 576 (W.D.Ark.1962), aff'd 315 F.2d 818 (8th Cir. 1963):

> Where no fiduciary or confidential relationship exists, fraud in obtaining a release is not presumed, but must be clearly and distinctly proved by the person who asserts it.

There is not only a complete lack of clear and distinct evidence of fraud presented, there is a total failure to demonstrate even a scintilla of evidence hinting at fraud. The supporting and opposing materials fairly shriek of the absence of such evidence. Moreover, it has been held that an injured party who is able to read has no right to rely upon a claim agent's misrepresentations as to the contents of a release. *Texas Co. v. Williams*, 178 Ark. 1100, 13 S.W.2d 309 (1929). When asked what plaintiffs thought the release said and what it meant, Mrs. Fitzwater declared:

A. That if I signed it, that the case would be closed . . .

Q. And you understood what the release said, did you not?

A. I understood.

(Depo.—Mrs. Fitzwater, pp. 11–27).

Mr. Fitzwater testified similarly. (Depo. —Mr. Fitzwater, p. 43).

Thus, the Court concludes that there is no genuine issue of material fact on this point, under any definition of "genuine".

■ Similarly, in order to void a release on the ground of duress it is necessary to show that threatening or menacing circumstances were such as to excite the reasonable apprehensions of a person of ordinary courage, and that the contract was made under the influence of same. *Bosly v. Shanner*, 26 Ark. 280 (1870); 76 C.J.S. Release § 28, p. 657.

■ In order for a release to be avoided on the ground of undue influence, the will of the releasor must be so overborne that voluntary action on his part is prevented. 76 C.J.S. Release § 30, p. 658.

However, the well established general rule is that the releasor's necessitous circumstances will not alone invalidate a release. 76 C.J.S., supra, § 29, p. 658.

Donald Fitzwater testified that he was not in fear in any way when he signed the release. (Depo.—Donald Fitzwater, p. 43). Barbara Fitzwater likewise stated that she feared no disadvantageous collateral consequences of not signing the release. (Depo. —Barbara Fitzwater, p. 27).

The Court finds that no genuine issue of fact on this point has been raised. The Court has not the "slightest doubt" that an issue of duress or undue influence is not presented.

■ Similarly, the plaintiffs have failed to show facts sufficient to raise a genuine issue of fact as to "mistake". To be grounds for avoidance of the executed release, the mistake must be mutual. *Fullerton v. Storthz*, 182 Ark. 751, 33 S.W.2d 714 (1930); *Hutcheson v. Frito-Lay, Inc.*, 315 F.2d 818 (8th Cir. 1963). Naturally, however, the unilateral mistake of one party, if accompanied by fraud or misrepresentation or inequitable conduct by the other party, may be sufficient to avoid a release. *Foster v. Dierks Lumber & Coal Co.*, 175 Ark. 73, 298 S.W. 495 (1927). In such a case the proof must be clear, unequivocal and convincing. *American Alliance Ins. Co. v. Paul*, 173 Ark. 960, 294 S.W.2d 58 (1927); *Hutcheson, supra*. Here, however, there is no genuine possibility of fraud or misrepresentation on the part of the insurance company. It is abundantly clear that the mistake could not have been mutual. Defendant Wausau surely understood it. As noted above, it is beyond question that plaintiffs read the release and understood it. Their mistake, if any, concerned Mr. Fitzwater's true condition, not the legal effect of the release. In any event, there is absolutely no evidence of fraud, misrepresentation or other inequitable conduct, and hence, the possible existence of a unilateral mistake raises no genuine issue of material fact as to the validity of the releases here. *Hutcheson, supra*. The release was good as

**294**

against the subsequently developed injuries because it was executed in the light of conditions as they then existed. *Wilson v. Southwest Cas. Ins. Co.*, 228 Ark. 59, 305 S.W.2d 677 (1957).

In a similar vein, while consideration for the release is required, *Green v. Owens*, 254 Ark. 574, 495 S.W.2d 166 (1973), the adequacy of the consideration must be viewed as of the time of its execution. *St. Paul Fire & Marine Ins. Co. v. Hundley*, supra. Further, the waiver of a legal right or forbearance to exercise it is sufficient consideration on the part of plaintiffs. *Green*, supra. In any event, inadequacy of consideration alone is not sufficient to vitiate a release. *Harmon v. Harrison*, 201 Ark. 988, 147 S.W.2d 739 (1941). It may be taken into account along with all the other circumstances surrounding the procuring of the release. *Hutcheson*, supra. Here however, from the matters submitted, there is no question but that there were no other pertinent circumstances surrounding the execution of the release. Thus, the inadequacy of consideration does not rise to the level of a genuine issue of a material fact in the instant case.

Nonetheless, the consideration paid by the insurer, $1,746.50, was, as a matter of law, not grossly inadequate in light of the circumstances as of the time of the execution of the releases. However, inasmuch as the Court has found no genuine question presented as to fraud, mistake, duress, undue influence, or lack of capacity, the adequacy of consideration is not material in itself.

Thus, the Court finds that there is no genuine issue of material fact presented which could avoid the effect of the releases.

The Court is ever mindful of the fact that the summary judgment procedure must be used with due regard for its purposes and should be cautiously invoked so that no person will be improperly deprived of a trial of disputed factual issues. *Traylor v. Black, Sivalls & Bryson, Inc.*, 189 F.2d 213 (8th Cir. 1951). However, where, as here, there is not the slightest doubt that there is not a genuine *factual* dispute, reasonably open to varying interpretations, then the requirements of Rule 56 are met, and the procedure should be viewed with favor and applied according to its terms.

The Court is not unsympathetic to the plaintiffs. Plaintiffs freely and voluntarily entered into an agreement. The fact that they did not previously consult an attorney, in hindsight, perhaps caused plaintiffs to enter a bad bargain. That it was unwise and unfortunate is certainly tragic. But as defendants note:

A contract of this kind executed as this was cannot be treated as a scrap of paper and ignored by the law.

*Gus Blass Co. v. Tharp*, 194 Ark. 255, 106 S.W.2d 608 (1937).

Accordingly, judgment will be entered forthwith for defendants against both plaintiffs, Donald Fitzwater and Barbara Fitzwater.

### Conclusions of Law

1. When a motion for summary judgment is made and supported by affidavits or otherwise as provided in Rule 56, an adverse party may not rest upon the mere allegations or denials of his pleadings, but must respond, by use of affidavits or otherwise, setting forth specific facts showing that there is a genuine issue of material fact for trial. Fed.R.Civ.Pro. 56(e).

2. Under Arkansas law, a release of damages for personal injuries may be disregarded where the plaintiff's mental or physical condition is such that he could not appreciate the character of the instrument and the consequences of executing it. *St. Louis, I. M. & S. Ry. Co. v. Bearden*, 107 Ark. 363, 155 S.W. 499 (1913).

3. Where an injured party executes a release of damages for personal injuries, and is able to appreciate the character of the instrument and the consequences of executing it, but is mistaken as to the seriousness of the injuries or the extent of damages, the release is not avoidable on that ground. *Bearden*, supra; *St. Paul & Marine Ins. Co. v. Hundley*, 354 F.Supp. 655 (W.D.Ark.1973).

4. A summary judgment is an extreme remedy, and any doubt as to whether there is a genuine issue of material fact for trial should be resolved against the moving party. *Williams v. Chick*, 373 F.2d 330 (8th Cir. 1967). In order to justify a summary judgment, it must clearly appear that the factual issues are so unsubstantial that it would be obviously futile to try them. *Ford v. Luria Steel and Lumber Corp.*, 192 F.2d 880 (8th Cir. 1951); *Caylor v. Virdin*, 217 F.2d 739 (8th Cir. 1955).

5. Where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, summary judgments are looked upon with favor. *Freeman v. Continental Gin Co.*, 381 F.2d 459 (5th Cir. 1967). The objective of the summary judgment procedure is to pierce the allegations of the pleadings. If reasonable men might differ as to the significance of the evidence, summary judgment is improper. *Chenette v. Trustees of Iowa College*, 431 F.2d 49 (8th Cir. 1970).

6. The material offered in support of or opposition to a motion for summary judgment may be used to determine whether any issues are genuinely disputed, but may not be used to resolve factual issues genuinely disputed. *U. S. ex rel. Jones v. Rundle*, 453 F.2d 147 (3rd Cir. 1971); *Carter v. Williams*, 361 F.2d 189 (7th Cir. 1966).

7. Every person is presumed mentally competent in the absence of proof to the contrary. 29 *Am.Jur.*2d, "Evidence", § 202, p. 255; 76 C.J.S., Evidence § 147.

8. There is not the "slightest doubt" that a genuine issue of fact remains as to plaintiffs' mental condition at the time of the execution of the releases, and hence, summary judgment on this issue is proper. *Clausen & Sons, Inc. v. Theo Hamm Brewing Co.*, 395 F.2d 388 (8th Cir. 1968); *Armco Steel Corp. v. Realty Inv. Co.*, 273 F.2d 483 (8th Cir. 1960).

9. Under Arkansas law, fraud may be shown to set aside a release. *Creswell v. Keith*, 233 Ark. 407, 344 S.W.2d 854 (1961). Such fraud, however, is never presumed, and must be clearly and distinctly proved by the person asserting it. *Hutcheson v. Frito-Lay, Inc.*, 315 F.2d 818 (8th Cir. 1963). An injured party who is able to read has no right to rely upon the alleged misrepresentations as to the contents of a release. *Texas Co. v. Williams*, 178 Ark. 1100, 13 S.W.2d 309 (1929). There is no genuine issue of fact presented with respect to fraud, and hence, summary judgment on this point is proper. *Clausen & Sons, Inc.*, supra.

10. Under Arkansas law, in order to avoid a release on the ground of duress it is necessary to show that threatening or menacing circumstances existed which were such as to excite the reasonable apprehensions of a person of ordinary courage, and that the contract was made under the influence of same. *Bosly v. Shanner*, 26 Ark. 280 (1870).

11. In order for a release to be avoided on the ground of undue influence, the will of the releasor must be so overborne that voluntary action on his part is prevented. The releasor's necessitous circumstances will not alone invalidate a release. There is no genuine issue of fact presented on the issues of duress and undue influence, and hence, summary judgment on this point is not precluded. *Clausen & Sons, Inc.*, supra.

12. To be grounds for the avoidance of an executed release, a mistake must be mutual. *Fullerton v. Storthz*, 182 Ark. 751, 33 S.W.2d 714 (1930); *Hutcheson*, supra. The unilateral mistake of one party, if accompanied by fraud or misrepresentation or inequitable conduct by the other party, may be sufficient to avoid a release. *Foster v. Dierks Lumber & Coal Co.*, 175 Ark. 73, 298 S.W. 495 (1927). In such a case the proof must be clear, unequivocal, and convincing. *American Alliance Insur. Co. v. Paul*, 173 Ark. 960, 294 S.W.2d 58 (1927); *Hutcheson*, supra. There is no genuine issue of material fact with respect to fraud or misrepresentation on the part of either defendant, and there is no genuine issue of material fact that a mutual mistake existed in the instant case. Thus, summary judgment on this point is not improper. *Wilson v. Southwest Cas. Ins. Co.*, 228 Ark. 59, 305 S.W.2d 677 (1957); *Clausen & Sons, Inc.*, supra.

13. Consideration is required for a valid release. *Green v. Owens*, 254 Ark. 574, 495 S.W.2d 166 (1973). The adequacy of the consideration, however, is to be viewed as of the time of its execution. *St. Paul Fire & Marine Ins. Co.*, supra. Further, inadequacy of consideration alone is not sufficient to vitiate a release. *Harmon v. Harrison*, 201 Ark. 988, 147 S.W.2d 739 (1941). There is no genuine issue of material fact on the issue of sufficiency of consideration, and hence, summary judgment on this issue is not precluded. *Clauson & Sons, Inc.*, supra.

14. The consideration paid by defendant Wausau was not, as a matter of law, so grossly inadequate in light of the circumstances existing as of the time of the execution of the releases as to constitute a failure of consideration. There is no genuine issue of material fact on this point, and summary judgment on this issue is, hence, proper.

15. None of the legal avenues available to plaintiffs in attempted avoidance of the releases are subject to genuine dispute. There is not the slightest doubt that there is not a genuine factual issue present. Consequently, plaintiffs are bound by the clear, plain, unambiguous and unequivocal terms of the releases. Therefore, defendants are entitled to judgment as a matter of law, under principles of state law applicable to the instant case.