Roland H. TROXELL et ux *v.* T. G. SANDUSKY et ux

5-5073                                    448 S. W. 2d 28

Opinion delivered December 22, 1969

*Carrol Cannon,* for appellants.

*Fletcher Long, Jr.,* for appellees.

J. FRED JONES, Justice. This is an appeal by the defendants, Mr. and Mrs. Troxell, from a decree of the St. Francis Chancery Court setting aside the sale of real property from the Troxells to the original plaintiffs, Mr. and Mrs. Sandusky.

The Troxells owned a house and lot on the bank of Lake St. Francis and listed the property for sale with Mrs. Walker, a real estate agent. Mrs. Walker showed the property to Mr. and Mrs. Sandusky who subsequently purchased it direct from the Troxells for $14,750. One thousand two hundred fifty dollars of the purchase price was paid in cash and the Sanduskys executed their note, secured by a mortgage on the property, for the balance of $13,500 to be paid over a 15 year period in monthly installments of $121.33 per month. The Sanduskys took title by warranty deed dated November 24, 1967, and moved into the house on that day or the next.

Lake St. Francis was formed by impounding the water in a small natural stream behind a dam across the stream. The inundated channel of the original stream was near the property involved, and a shelf or small plateau extended from the edge of the original stream to the higher lake bank upon which Troxells built the house they sold to the Sanduskys. The lakeshore was all of loose type soil and the water level of the lake

fluctuated with weather conditions, sometimes rising well above the shelf leading out to the original stream bank in wet weather and leaving the shelf exposed to view in dry weather. A concrete walk was built from the house to the edge of the lake bank above the shelf and at this point the lakeshore dropped vertically from the end of the walk six or eight feet to the shelf, and then farther out toward the original stream channel, the shelf dropped more or less vertically to the bottom of the original channel. When the lake water was at its full height, the surface of the lake was only two or three feet lower than the end of the walk and the shelf on out to the original channel of the stream was inundated beneath the surface of the lake. When the lake water was at its lowest level in dry weather, the shelf, at and below the end of the walk, was exposed to veiw.

The Sanduskys were first shown the property by the agent, Mrs. Walker, in the latter part of October when the water level in the lake was low and the shelf about six or eight feet below the end of the walk was exposed. Several slabs of broken-up concrete had been placed on the shelf to prevent erosion. Soon after the Sanduskys took possession of the property and moved into the house, the level of the lake came up and during the succeeding months the action of the waves caused erosion of the lakeshore toward the house and cut the bank from under the end of the walk. On January 26, 1968, the Sanduskys filed their complaint for cancellation of their note and mortgage, as well as for damages, because of fraudulent misrepresentations as to the stabilization of the lakeshore line adjacent to the property. The case was tried on December 6, 1968, and the chancellor rendered a decree on March 10, 1969, finding that there was no fraud attending the transaction, but the petition was granted because of mutual mistake. The decree recites, in part, as follows:

"Soon after the purchase the buyer became aware of the erosion and instituted the action herein.

The proof was not sufficient to show fraudulent intent on the part of the Vendor; however, it is my opinion that fraudulent intent is not necessarily a prerequisite element in a question of rescission. In 228 Ark. 824, *Blythe* v. *Coney,* the erroneous assumption of the parties to a purchase contract that there was a sufficient supply of city water to a dwelling house to make it livable, was held to constitute a mutual mistake of a material fact giving the purchaser the right to rescind.

Herein, the buyer, when learning of an erosion problem before purchase, duly inquired, which was his responsibility, and was led to believe that the erosion problem was corrected by a material affirmative remedy; namely, the large concrete slabs which were shown to him.

Conceding that the Vendor had no fraudulent intent he offered the property for sale upon the basis that the erosion had been stopped; to say otherwise would be an admission that he sold the property knowing that it would wash and erode wherein he should have disclosed it to the buyer. To deny relief to the Plaintiffs thus requiring them, in addition to the purchase price, to expend a large amount for corrective measures in order to prevent further erosion and ultimate destruction of the property, would be unconscionable in my opinion.

IT IS THEREFORE CONSIDERED, ORDERED AND DECREED that the plaintiffs have and recover the sum of $1,250.00 from the defendants for the down payment on purchase price on the property described in the deed of trust; that the plaintiffs shall have restored to them the amounts paid into the registry of the court totaling $727.98; that the deed of trust at Book 296, page 385, Records of St. Francis County as well as the note described therein shall be in all things cancelled and plaintiffs dis-

charged of any liability thereon; that the plaintiffs restore to the defendants the furnishings or other personal property which were in the dwelling and were a part of the sale; that the defendants' motion to file cross-complaint is denied; that the deed from defendants to the plaintiffs to the property described as recorded at Book 296, Page 385 of the Records of St. Francis County is cancelled; and that the plaintiffs have and recover from the defendants the sum of $63.70 costs herein expended.

All of the money payments mentioned herein shall bear interest at the rate of six percent (6%) per annum from the date of this order until paid.''

On appeal to this court the Troxells rely on the following points for reversal:

''The court erred in holding that under the evidence, the appellees were entitled to rescission of the sale and cancellation of the purchase money mortgage. The court erred, if rescission is granted, in failing to charge the rental value of the property against appellees.''

We are of the opinion that the decree of the chancellor is not clearly against the preponderance of the evidence as to the first point, but we agree with Mr. and Mrs. Troxell on their second point. There is considerable conflict in the evidence as to the *extent* of erosion, and as to the width of the shelf when concrete slabs were placed on it. There is no conflict in the evidence that there was considerable erosion of the lakeshore adjacent to the house and there is no question that erosion presented a problem, both before and after the sale to Mr. and Mrs. Sandusky. The Sanduskys testified that the lakeshore or bank extended two or three feet beyond the end of the walk when they purchased the property and there is no testimony to the contrary. It is obvious from the photographs offered in evidence that the

ground had eroded from under the end of the sidewalk. The evidence is clear that Mr. Troxell had placed ten or twelve large slabs of concrete on the ledge under the bank at the end of the walk as a protection against erosion, and the evidence is clear that all these slabs of concrete, except three, had disappeared into the deep channel of the original stream when the shelf they were on eroded from under them.

The Sanduskys testified that when agent Walker first showed them the property, there were eight or nine slabs of concrete visible on the ledge below the bank at the end of the sidewalk; that the slabs of concrete reached all the way to the end of the sidewalk and that they asked Mrs. Walker about whether the bank had been washing. Mr. Sandusky testified:

> "A.   I asked her this, if the bank had been washing and she said it had a little bit but they had put slabs in and it had stopped it."

Mrs. Sandusky testified:

> "A.   Well, we went outside and my husband and Mrs. Walker were standing on the edge of the bank and I hadn't gone up to the edge of the bank and I heard him say to her 'does the bank wash' and she said something like 'a little bit but that is what the slabs are for' and she said 'that stopped it,' so I walked over there and I looked down at the slabs and the water, you could just barely see the slabs, it was just almost on top of the slabs, you could not see what the slabs were laying on. You could just barely see the slabs."

Mrs. Walker denied that there was any discussion about the bank eroding and denied that any questions were asked or answers made concerning it.

Mr. Troxell testified that two or three feet of the

bank or lakeshore had eroded into the lake and that he placed the concrete slabs to prevent erosion. He testified as follows:

> "Q. Now, Mr. Troxell has the—I believe you testified that the high bank has come back two or three feet . . . is that correct?
>
> A. Yes, sir, I would say from 2 to 3 feet.
>
> Q. You heard this testimony about the concrete blocks being down there?
>
> A. Yes, sir.
>
> Q. Was that testimony correct?
>
> A. Yes, sir.
>
> Q. Was the purpose of the concrete blocks to stop any bank erosion?
>
> A. Yes, sir, to stop the slapping of the waves against the bank.
>
> Q. And as far as you were concerned it had stopped satisfactory?
>
> A. I thought it had. It did a pretty good job. I didn't go out there much in the last two years."

Mr. Troxell testified that Mr. Sandusky asked him about the concrete slabs and that he told Mr. Sandusky he had put them there but did not know whether they would stop the erosion or not.

The evidence is clear that the lot sold to the Sanduskys was being eroded away by the waves on the lake and that Mr. Troxell put concrete slabs along the bank

to prevent further erosion. Though Mrs. Walker denies that she advised the Sanduskys that the concrete slabs had stopped the erosion, or that she discussed the erosion problem with them at all, Mr. Troxell did discuss the problem with the Sanduskys and Mr. Troxell testified that he thought that the concrete slabs had stopped the erosion. The chancellor's finding that Mr. and Mrs. Sandusky believed, as did Mr. Troxell, that the concrete slabs had, and would, serve the purpose for which they were placed by Troxell and that the property was sold by Troxells and purchased by Sanduskys on this assumption, is not against the preponderance of the evidence. Subsequent events proved that Mr. Troxell, as well as Mr. and Mrs. Sandusky, was mistaken in the belief that the concrete slabs had stopped, and would prevent, further erosion, because it is clear that they did not. As a matter of fact the shelf, or original stream bank, on which the slabs were placed, eroded out from under the slabs causing them to slide or drop into the main channel of the original stream, and the erosion of the lot from the lake toward the house continued as before.

We are of the opinion that the chancellor was correct in his interpretation of our holding in *Blythe* v. *Coney*, 228 Ark. 824, 310 S. W. 2d 485, as recited in the decree, supra. The chancellor viewed the property involved in the case at bar; he saw the witnesses and was in a position to observe their demeanor while testifying, and we are unable to say that the chancellor's finding that there was a mutual mistake of a material fact is clearly against the preponderance of the evidence. We conclude, therefore, that the chancellor did not err in cancelling the notes and mortgage and setting aside the conveyance.

We are of the opinion, however, that the chancellor did err in not awarding a fair rental value of the property to Troxell for the period of time it was occupied by the Sanduskys. (See *Dunham* v. *Phillips,* 154 Ark. 87, 241 S. W. 361). The proprety was renting for $115 per

month at the time Sanduskys moved in on the day or next day after the deed was executed on November 24, 1967, so we conclude that $115 per month was fair rental value. The case was tried in chancery court on December 6, 1968, and Mr. Troxell testified, without contradiction, that he first knew that the Sanduskys had vacated the premises two or three days before the trial. Consequently, Troxell is entitled to the rental value of the premises for 12 months at $115 per month, in the total amount of $1,380, for which he should take credit against the payments made by the Sanduskys to Troxell and into the registry of the court. With this exception the decree of the chancellor is affirmed.

Affirmed in part and reversed in part.

HARRIS, C. J., and FOGLEMAN, J., dissent as to affirmance.