Robert P. MALAKUL and Orathai Malakul *v.* ALTECH ARKANSAS, INC., Djaya Kusuma and Pauline Kusuma, and Ivan Spiker

88-247                                                    766 S.W.2d 433

Supreme Court of Arkansas
Opinion delivered March 13, 1989
[Rehearing denied April 10, 1989.]

*Roy Whitehead, Jr.,* for appellant.

*Sutterfield Law Firm, P.A.,* by: *Dennis C. Sutterfield,* for appellees Altech Arkansas, Inc., Djaya Kusuma, and Pauline Kusuma.

*Randall W. Dixon,* for appellee Ivan Spiker.

TOM GLAZE, Justice. This case arises out of a partnership agreement between Mr. Malakul and Mr. Kusuma to develop fuel-alcohol plants. A corporation, Altech Arkansas, Inc. (Altech), was formed for carrying out the venture. Mr. and Mrs. Kusuma, individually and in behalf of Altech, filed suit in Johnson County Circuit Court against Mr. Malakul and his wife for fraudulently inducing the Kusumas to enter the aforementioned contract.[1] The Kusumas alleged that the Malakuls refused

---

[1] Along with this case, a lawsuit was filed against all the parties by Reece Brothers

to account for the monies the Kusumas invested in the parties' venture. They sought the return of their monies and also requested punitive damages. Appellee, Ivan Spiker, subsequently intervened filing suit against all of the foregoing parties, alleging he incurred damages by furnishing material, labor and supplies in constructing equipment for the parties' pilot plant which is located in Clarksville, Arkansas.

On the day of trial, the Kusumas narrowed their seven-page, six-count complaint, by explaining to the court that they were seeking equitable rescission of the parties' contract based upon the Malakuls' fraudulent misrepresentations. After all parties presented their respective cases, the chancellor awarded judgment against the Malakuls in favor of the Kusumas in the sum of $115,398.56, which represented the monies the Kusumas invested in the venture. In addition, Altech received a judgment against the Malakuls in the amount of $25,000, and the intervenor, Spiker, received a judgment of $50,450 against the Malakuls and Altech. Mr. Kusuma obtained a separate award against Altech in the sum of $54,681.91. The chancellor awarded no punitive damages. The Malakuls appeal from those judgments entered against them, raising seven points for reversal. We find none of the points have merit, and therefore affirm.

For the sake of clarity, we initially consider the four issues raised concerning whether the Kusumas' judgment against the Malakuls should be set aside. Mrs. Malakul first contends the Kusumas' complaint failed to state a cause of action against her, and for that reason, should be dismissed. We summarily dispose of this argument because it was never presented to the trial judge below. See Britton v. Floyd, 293 Ark. 397, 738 S.W.2d 408 (1987).

Next, both Malakuls argue that the Kusumas failed to meet their burden of proof in showing that either Mr. Malakul or Mrs. Malakul fraudulently induced the Kusumas to invest in the parties' venture and further urge that the chancellor erred in determining damages. We again disagree.

Apiaries, Inc. The circuit judge severed the present case and transferred it to the Johnson County Chancery Court.

A review of the evidence supports the finding that both Mr. and Mrs. Malakul played a role in fraudulently inducing the Kusumas to invest in a worthless venture. Mr. Kusuma was deputy director of the Accounts Division of the United Nations at the New York headquarters, and Mrs. Malakul was a member of his staff of 125 people. Kusuma actually first met Mrs. Malakul and her husband at a Christmas party on December 18, 1981. At this meeting, Mr. Malakul told Kusuma that he had succeeded in inventing a low pressure distillation system and had discovered a special enzyme to produce alcohol from waste. Kusuma testified that Mr. Malakul had suggested that Kusuma should invest in the project, indicating that a demand existed for Malakul's invention because it would lessen the dependence of countries on foreign oil. Malakul said that a large amount of money would be made once the machines producing the enzyme were manufactured. Kusuma further stated that Malakul represented (1) he had a degree in engineering and a masters degree in science from London College in England, (2) he had continued his research with a professor of Cornell University and had a company called Energy Development Systems International, (3) he had sold thirty-four pieces of his equipment to farmers in the United States, and (4) his machine would cost $18,000.00 and would be available on the market for $75,000.00.

Kusuma asserted that Mrs. Malakul corroborated her husband's representations by saying he had spent a lot of time and money in discovering and producing his special enzyme. Mrs. Malakul attended some of the meetings held to discuss the venture, encouraged Kusuma to invest and said that Dr. Ward, an authority in his field, would be willing to give a letter of recognition of her husband's work. Mrs. Malakul also gave Kusuma a brochure which assertedly compared Mr. Malakul's system with others. Based on the foregoing and other information provided by the Malakuls, Kusuma said that he signed a partnership agreement to join in Mr. Malakul's venture and invested substantial monies over the next few years in doing so. Sometime after signing the agreement, Malakul and Kusuma formed Altech for the purpose of manufacturing the equipment to be used to produce the fuel alcohol.

After signing the parties' agreement and giving money to both Malakuls on a number of occasions, Kusuma made repeated

demands for an accounting, which were refused. Kusuma said that he discovered that many of the representations previously made by Malakul were false. In particular, Kusuma finally received a letter from Dr. Ward, the expert mentioned earlier by Mrs. Malakul, and the letter reflected that Mr. Malakul did not possess the appropriate engineering credentials and experience to pursue the venture and that the brochure (which purportedly compared Malakul's system with other systems) contained a series of unrelated graphs and charts. The Ward letter also revealed that Malakul's patent related to ethylene glycol rather than alcohol. Spiker testified that Malakul had not developed the special enzyme, which was the integral part of the venture, but instead he had purchased the enzyme from another company. Spiker also revealed that when Kusuma's attorney asked for Spiker's "paper" on building the equipment for the pilot plant, Malakul wanted Spiker to prepare invoices that falsely reflected expenses not incurred so Malakul could use the invoices to get money from Kusuma.

Preponderance of the evidence is required to establish fraud in obtaining a contract by fraudulent representation. *Ray Dodge, Inc.* v. *Moore*, 251 Ark. 1036, 479 S.W.2d 518 (1972). To prove an action for deceit, one must show: (1) the defendant made a false, material representation (ordinarily of fact); (2) he had knowledge the representation was false or asserted a fact which he did not know to be true; (3) he intended the plaintiff should act on the representation; (4) the plaintiff justifiably relied on the representation; and (5) plaintiff was damaged as a result of such reliance. *Grendell* v. *Kiehl*, 291 Ark. 228, 723 S.W.2d 830 (1987). Here, we conclude the Kusumas clearly met their burden of proof. The Malakuls specifically argue the evidence is insufficient as to Mrs. Malakul. We cannot agree. Mrs. Malakul was employed under Mr. Kusuma's supervision, and she assisted in convincing Mr. Kusuma that her husband was an expert in this field of producing alcohol. Her statements regarding her husband's research and discovery of the enzyme were shown to be false. Combined with this evidence, we note that most of the money Kusuma contributed to the venture was given to Mrs. Malakul who transferred those sums through her checking account. The evidence also reflects that Mr. Malakul's presence in this country was due to a visa he obtained by virtue of Mrs.

Malakul's employment at the United Nations. From these facts, one could reasonably conclude that Mrs. Malakul played an important role, albeit supportive, in inducing the Kusumas to invest in Malakul's venture. In sum, we are unable to say the chancellor was clearly erroneous in entering judgment against both Malakuls.

■ We also find no merit in the Malakuls' assertion that the trial court erred in determining the measure of damages awarded the Kusumas. As noted earlier, the Kusumas sought restitution by their action and were apparently satisfied to recover their restitution in the form of money. In this respect, a plaintiff may sue in equity to rescind and if equity acquires jurisdiction for this purpose, it can proceed to order such monetary restitution as may be appropriate. See Dobbs, Remedies, § 9.4, p. 632 (1973); see also Massey v. Tyra, 217 Ark. 970, 234 S.W.2d 759 (1950). In Massey, the plaintiffs, the Tyras, sought rescission in equity of a contract for the purchase of land, requesting recovery of their down payment and reimbursement of expenses on the land. Tyras' ground for rescission was misrepresentation. The court held that the Tyras, in rescinding the contract for the vendor's fraud, could recover the amounts expended in good faith before discovering their right to rescind. See also Carter v. Matthews, 288 Ark. 37, 701 S.W.2d 374 (1986); Troxell v. Sandusky, 247 Ark. 898, 448 S.W.2d 28 (1969); Blythe v. Coney, 228 Ark. 824, 310 S.W.2d 485 (1958); Ballard v. Carroll, 2 Ark. App. 283, 621 S.W.2d 484 (1981).

In the instant case, the record reflects that the Kusumas gave the Malakuls checks totalling $115,509.56 and Kusuma testified that he had advanced the Malakuls $115,000.00 before the Clarksville plant was opened. Kusuma also testified that Altech had given Malakul $25,000.00. Based upon our review of the evidence, we believe the record fully supports the chancellor's award of $115,398.56 to the Kusumas and $25,000.00 to Altech.

■ The Malakuls next argue that Mr. Kusuma signed a release which was a valid settlement of all claims asserted by Altech and the Kusumas.[2] Such an argument ignores the rule

---

[2] Because we hold the release invalid for other reasons, we need not address the effect of Kusuma's signing a release for his wife and Altech.

that misrepresentations amounting to fraud may be shown to set aside a release. *Creswell* v. *Keith*, 233 Ark. 407, 344 S.W.2d 854 (1961). It has also been held plaintiffs are entitled to assert the fraud they claim if the entire transaction fatally infects the release upon which the defendants rely. *Schine* v. *Schine*, 254 F. Supp. 989 (S.D. N.Y. 1966); *see also Fitzwater* v. *Lambert & Barr, Inc.*, 539 F. Supp. 282 (W.D. Ark. 1982). Here, Kusuma testified that when he signed the release, he still believed Malakul's representations that he had been putting his share of the money into the venture, that the equipment was free from debt, and that the plant which had been constructed was a commercial production facility. In short, these misrepresentations, and others, typified the entire transaction or venture which also led to Kusuma signing the release now in issue. Thus, the evidence supports the view that the release was fatally infected by the Malakuls' overall fraudulent scheme, and we believe the chancellor was correct in deciding the release was not a valid settlement of the claims of Altech and the Kusumas.

██ The final two issues for consideration involve intervenor Ivan Spiker. Mrs. Malakul contends the court erred in awarding Spiker judgment against her because Spiker's proof failed to show that she fraudulently induced him to participate in the venture, since he had never met her. Spiker counters, saying the evidence showed that Mrs. Malakul participated in her husband's scheme and, for that reason alone, his judgment against her should stand. We agree. In *White River Prod. Credit Ass'n* v. *Fears*, 213 Ark. 75, 209 S.W.2d 294 (1948), this court recognized the rule that one who accepts the fruit of fraud, knowing the means by which they were obtained, is liable therefore even though he did not personally participate in the fraud. As discussed previously, the evidence shows not only that Mrs. Malakul obtained money from the Kusumas which she deposited in her personal account, but also that she actually participated in the scheme by selling the venture idea to the Kusumas and writing checks to Spiker and others whenever necessary.

██ Lastly, the Malakuls raise for the first time the argument that if Spiker was aware that Malakul was an agent for Altech or Kusuma, then Altech or Kusuma should be liable for the $50,450.00 judgment given Spiker, not the Malakuls. We

dispose of this matter merely by noting this argument was not pled or argued below, therefore, we need not address it on appeal. See, e.g., *Read* v. *Alcoholic Beverage Control Div.*, 295 Ark. 9, 746 S.W.2d 368 (1988).

Because we find no merit concerning the points raised by the Malakuls, we affirm.

HICKMAN, DUDLEY and NEWBERN, JJ., dissent.

DAVID NEWBERN, Justice, dissenting. The decision should be reversed and dismissed because the chancery court lacked jurisdiction of the subject matter of the action. The circuit court has jurisdiction of a civil action if jurisdiction has not been vested in another court established by the Arkansas Constitution. Ark. Const. art. 7, § 11.

The complaint in this case was plainly one for damages for deceit. Punitive damages were sought. As the majority opinion points out, the complaint was filed in the circuit court but, for reasons not disclosed by the record, transferred to the chancery court. At the outset of the hearing, the chancellor was apparently exploring with counsel the nature of the remedy sought.

> BY MR. SUTTERFIELD [counsel for the plaintiffs Altech and Kusuma]: . . . . Your Honor, if I could make a very brief opening statement. Your Honor, essentially the claim being brought by my clients against Mr. Malakul is one based on equitable rescission of contract due to . . . fraudulent misrepresentation.

Counsel then explained the facts surrounding the entry of the agreement including misrepresentations on which the plaintiffs relied. He also explained the position of plaintiff Spiker who was one of the creditors and who allegedly had been asked by Malakul to participate in the fraud.

After responses by Mr. Whitehead, who represented the defendants, and Mr. Dixon representing Mr. Spiker, the court inquired of Mr. Dixon whether Spiker's lien had been filed on time. Dixon replied that there was no lien, and that Spiker's action was on his agreement with Malakul.

> BY THE COURT: You are suing for debt then?

BY MR. DIXON: Yes, sir. That's basically what it is.

BY THE COURT: Let me ask one other thing. How did this get out of Circuit Court? Why is it out?

BY MR. SUTTERFIELD: It's out based on —

BY THE COURT: Thickness of the file?

BY MR. SUTTERFIELD: Probably, your honor.

From that point on, the case became a jurisdictional charade which continues unabated in this court.

The complaint of the Kusumas sought compensatory damages and punitive damages. The proof went to their losses rather than to the restitutionary award which would have been proper had this truly been a rescission action. Although the trial court's judgment and the majority opinion here both avoid use of the term "damages" (and no punitive damages were awarded), there is no other legitimate description for the money judgments which were sought and granted. The answer filed by the Malakuls stated that Mrs. Malakul was not a party to the "dealings" between Robert Malakul and Mr. Kusuma and it sought dismissal of the complaint against her. Not only was she not dismissed, the judgment, which can only be characterized as one for damages, was awarded jointly and severally against Mr. and Mrs. Malakul. There was not even an allegation that Mrs. Malakul was a party to the contract, although it was alleged, and there was evidence from which it could have been concluded, that she was a party to the tort of deceit. It is difficult to imagine how the court could award restitution against a person on the basis of rescission of a contract to which it was not even alleged she was a party.

In *Liles* v. *Liles*, 289 Ark. 159, 711 S.W.2d 447 (1986), and *Carter* v. *Phillips*, 291 Ark. 94, 722 S.W.2d 590 (1987), we noted that we would not raise the question of a chancery court's jurisdiction on appeal unless it was wholly incompetent to have heard the case. That is the situation here. No equitable remedy was sought in the pleadings, and the weak statement of counsel that this was a rescission case is to no avail. If it were not clear enough at the trial that this was a deceit action, it becomes eminently so upon reading the majority opinion's references to and reliance on the elements of a deceit action set out in *Grendell*

v. *Kiehl*, 291 Ark. 228, 723 S.W.2d 830 (1987), which was clearly a tort action for deceit tried properly in the circuit court.

While I can understand the temptation to overlook the jurisdictional issue when the parties are unconcerned about it, and when raising it may seem to upset a fair result, we have held that "[w]hen a trial court enters an order without jurisdiction over the subject matter, the question cannot be overlooked even if not raised." *Larey* v. *Continental Southern Lines, Inc.*, 243 Ark. 278 at 286, 419 S.W.2d 610 at 615 (1967).

We have gone as far as we can or should go in effacing the jurisdictional lines between our chancery and circuit courts by our liberal interpretation of the cleanup doctrine. *See, e.g., Liles* v. *Liles, supra*. This case does not involve the cleanup doctrine. If the courts of law and equity are to be merged, leaving only the matter of jury trial dependent on the form of action or remedy sought, the constitution must be changed. It should not be done by judicial fiat.

HICKMAN, J., and DUDLEY, J., join this opinion.