In re Albert D. NARCISO
and Kathleen Narciso.

The ESTATE of Sara O. ECKEL, Gary
Eckel as Administrator of the Estate
of Sara O. Eckel, Plaintiffs,

v.

Albert D. NARCISO, Individually and
d/b/a Apogee Appraisal Service and
Kathleen Narciso, Individually and
d/b/a Insurance Marketing Service
a/k/a Kathleen McMillon, Defendants.

Bankruptcy No. 91–10129 S.
Adv. No. 91–1013.

United States Bankruptcy Court,
E.D. Arkansas,
Batesville Division.

Oct. 7, 1992.

Jeffrey E. Hance, Batesville, Ark., for plaintiffs.

Loyd Harper, Ash Flat, Ark., for defendants.

James F. Dowden, Little Rock, Ark., trustee.

## MEMORANDUM OPINION

MARY D. SCOTT, Bankruptcy Judge.

This cause came before the Court upon the trial on the Complaint to Object to Dischargeability of Debt Pursuant to 11 U.S.C. § 523, filed on August 19, 1991. The defendant answered with a general

denial. Trial was held on July 28, 1992, Jeffrey Hance appearing for the plaintiffs and *Loyd Harper* appearing for the defendants.

■ The complaint requests that the debt owed by debtor be declared non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). In addition, the prayer for relief requests that judgment be entered against all defendants based upon fraud and misrepresentation. The complaint contains sufficient allegations for the request to reduce the debt to judgment to be before the Court. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a), 1334. The request for a determination of dischargeability is a "core proceeding" within the meaning of 28 U.S.C. § 157(b) as exemplified by 28 U.S.C. § 157(b)(2)(I). The request to reduce the debt to judgment, however, is not a core proceeding, such that judgment must be entered by the district court. 11 U.S.C. § 157(c). Accordingly, this Court submits separate proposed findings of fact and conclusions of law to the district court for entry of judgment on the debt.

### A. *Gary Eckel's Capacity to Sue*

At trial, at the conclusion of the testimony of Gary Eckel, defendants objected to his testimony on the grounds that no probate estate had been opened for Sarah Eckel. The defendants did not move to amend their answer, did not move to dismiss on the basis that Gary Eckel was not a proper party, did not move to strike his testimony. They simply objected to Eckel's testimony at the conclusion of the direct examination. It appears that defendants are in some manner challenging plaintiff's standing to bring suit.

■ Plaintiff's capacity to sue was not raised as an issue in the answer filed by defendants. The answer was simply a general denial. Rule 9(a), Federal Rules of Civil Procedure,[1] specifically requires that

When a party desires to raise an issue as to the legal existence of any party or the

capacity of any party to sue or be sued or the authority of a party to sue or be sued in a representative capacity, *the party desiring to raise the issue shall do so by specific negative averment,* which shall include such supporting particulars as are peculiarly within the pleader's knowledge.

(Emphasis added.) The failure of the defendants to raise this issue in their pleading constitutes a waiver of the defense. *Lang v. Texas & Pacific Railway Company,* 624 F.2d 1275, 1277 (5th Cir.1980) (defendants waived objection to widow's capacity to sue as representative of estate where defendants failed to plead lack of capacity); *Berstein Seawell & Kove v. Bosarge,* 813 F.2d 726, 731 (5th Cir.1987). No motion to amend has been filed and thus has not been considered by the Court. Even were defendants' objection construed as an oral motion to amend, it would be denied as prejudicially untimely.

■ In any event, the argument appears to be incorrect as a matter of law. In *Gladden v. Bucy,* 299 Ark. 523, 772 S.W.2d 612 (1989), the Arkansas Supreme Court ruled that the trial court erred in dismissing complaint filed by the executor of the estate. The trial court should have substituted the heirs as the real parties in interest in a negligence action against an insurance company. The situation here is similar. Gary Eckel, is the administrator of Mrs. Eckel's affairs. He is also the heir under Mrs. Eckel's will. Accordingly, he is the real party in interest, and may maintain this suit.

### B. *The Debt is Non–Dischargeable*

■ Before the Court is the issue of whether the debt owed to the estate of Sarah O. Eckel is non-dischargeable in this bankruptcy proceeding. Plaintiff proceeds under section 523(a)(2)(A), which provides in pertinent part:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

---

1. Rule 9 is applicable to these proceedings by virtue of Rule 7009, Federal Rules of Bankrupt- cy Procedure.

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A).

This Court finds that the $33,952.40 obtained from Sara O. Eckel by Kathleen McMillon and Albert Narciso was obtained by actual fraud such that the debt is nondischargeable. In order for a debt to be declared nondischargeable under section 523(a)(2)(A), the plaintiff must demonstrate that:

(1) the debtor made the representations;

(2) that at the time debtor knew they were false;

(3) that debtor made them with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on such representations;

(5) that the creditor sustained the alleged loss and damage as the proximate result of the representations having been made. *Thul v. Ophaug*, 827 F.2d 340, 342 & n. 1 (8th Cir.1987).[2]

The exception under section 523(a)(2)(A) was established in order to "discourage fraudulent conduct and to ensure that relief intended for honest debtors does not inure to the benefit of the dishonest." *Jennen v. Hunter*, 771 F.2d 1126, 1130 (8th Cir.1985) (quoting *In re Wilson*, 12 B.R. 363, 370 (Bankr.M.D.Tenn.1981)). Generally, fraudulent intent is the most difficult element for the plaintiff to prove because it

must generally be established by circumstantial evidence. *Matter of Van Horne*, 823 F.2d 1285, 1287 (8th Cir.1987) ("Creditors may present evidence of the surrounding circumstances from which intent may be inferred. When the creditor introduces circumstantial evidence proving the debtor's intent to deceive, the debtor 'cannot overcome [that] inference with an unsupported assertion of honest intent.'"). In *Van Horne*, the Eighth Circuit indicated how intent may be derived from the circumstantial evidence:

The focus is, then, on whether the debtor's actions 'appear so inconsistent with [his] self serving statement of intent that the proof leads the court to disbelieve the debtor.'

*Id.* at 1288. In this instance, the plaintiff was presented with a situation in which the person from whom the funds were swindled is deceased. Accordingly, plaintiff was required to prove fraudulent intent primarily from the testimony of the perpetrators. Despite these evidentiary handicaps, the fraud in this case is overwhelmingly apparent.

Mrs. Eckel was an elderly lady of comfortable means whose funds were taken from her by the fraudulent acts of Albert Narciso and Kathleen Narciso [McMillon].[3] Gary Eckel, Mrs. Eckel's stepson who lived in Wisconsin, last saw Mrs. Eckel in April 1990. He spoke with Mrs. Eckel often, generally ten to twelve times each month. While she was very sharp mentally in April 1990, over the summer her health deteriorated rapidly. During the telephone conversations, she had a weakened voice. She

---

**2.** The elements of the cause of action for fraud are nearly identical to an action for determination of dischargeability based on fraud. The only distinction is that under state law the reliance must be reasonable, *Malakul v. Altech Arkansas, Inc.*, 298 Ark. 246, 766 S.W.2d 433, 436 (1989), whereas, in a suit to determine dischargeability, reasonableness of the reliance is not an issue, *Thul v. Ophaug*, 827 F.2d 340, 342 (8th Cir.1987). The elements of a cause of action for fraud under Arkansas law are:

(1) defendant made a false, material representation (ordinarily of fact);

(2) defendant had knowledge the representation was false or asserted a fact which he did not know to be true;

(3) defendant intended the plaintiff should act on the representation;

(4) the plaintiff justifiably relied on the representation; and

(5) the plaintiff was damaged as a result of such reliance. *Barnett v. Arkansas Transport Company, Inc.*, 303 Ark. 491, 800 S.W.2d 429, 430 (1990); *Malakul*, 766 S.W.2d at 436; *accord Vanderboom v. Sexton*, 460 F.2d 362, 366 (8th Cir.1972).

**3.** Kathleen Narciso, the named debtor in the bankruptcy case, also uses the name Kathleen McMillon. She is referred to as McMillon in this opinion.

was also fearful of getting up from her bed or couch because she would fall over. The exhibits which bear Mrs. Eckel's signature show a very shaky script.

During the conversations between the Eckels, it was clear that Mrs. Eckel was forgetting details of the recent past. For example, in one conversation, Mrs. Eckel forgot that Mr. Eckel's daughter was married, although Mrs. Eckel had attended the wedding. Mrs. Eckel generally refused any assistance for financial advise from others, even members of her family: she was a feisty person, "stubborn when it came to money" and did not want anyone meddling in her business. In November 1990, Mrs. Eckel died.

When Mrs. Eckel died, Gary Eckel was called by a family friend to come to Arkansas to take care of her estate. He located a Will in which he was named executor. Probate was not opened pursuant to his attorney's advice. Gary Eckel had all of Mrs. Eckel's mail forwarded to his address in Wisconsin. Gary Eckel discovered only one health-related insurance policy held by Mrs. Eckel—a health insurance policy to supplement social security and medicare. The only mail he received regarding insurance was a renewal notice on that supplemental health insurance policy.

In investigating the assets of the estate, he checked with the firm Edward D. Jones & Co., in which Mrs. Eckel had previously invested a large sum of money. He discovered that Mrs. Eckel had previously liquidated that account and received two checks totalling $33,952.40. Both of these checks, dated August 13, and 14, 1990, made payable to Sarah O. Eckel, were deposited into an account held by "Insurance Marketing Services Kathleen McMillon." Both Ms. McMillon and Albert Narciso admitted receipt of these funds.

In September 1987, McMillon formed a company called Insurance Marketing Services which sold medical supplement insur-

ance, nursing home plans, health insurance and annuities. She had three agents working for her at Insurance Marketing Services and operated as managing broker/agent for twenty-nine independent contractors. Albert Narciso, McMillon's husband, was vice president of Insurance Marketing Services, but was not a licensed insurance agent. Narciso testified that, as far as he was concerned, he had no authority within the context of that business. He performed janitorial and maintenance services for Insurance Marketing Services. He was authorized to sign checks on Insurance Marketing Accounts.[4] McMillon testified that Narciso was also "doing business as Insurance Marketing Service." This, like many of their statements and actions, is not only contradictory, but also appears to be a violation of Arkansas law. *See, e.g.,* Ark.Stat. 23–64–211 (persons doing business for insurance agency must be licensed).

McMillon testified that she had been acquainted with Mrs. Eckel for ten years. In January of 1988, McMillon gave a medicare seminar attended by Mrs. Eckel. From that point, McMillon "formed a bond" with Mrs. Eckel: they visited Mrs. Eckel's elderly friends and went shopping together. McMillon testified that she did not offer advice to Mrs. Eckel "until she came to me." McMillon was fully aware that Mrs. Eckel was in rather frail health: she was cognizant of the vertigo suffered by Mrs. Eckel and the various medications she was required to take.

Narciso also operated a company called Apogee Appraisal Services. He apparently befriended Mrs. Eckel separately, but near the same time. He first met Mrs. Eckel while working as an air conditioning repairman, when he made a service call at her home. Apogee's office was across the hall from Insurance Marketing Services. Apogee's funds were generally commingled with Insurance Marketing Services' funds.[5]

---

4. The answers to interrogatories served by defendants indicated that only Kathleen McMillon was authorized to sign on the accounts.

5. McMillon's explanation of the comingling is representative of the tenor of her testimony.

McMillon testified that they comingled the funds "unknowingly" until her accountant pointed out that they were in fact comingling. As a licensed real estate broker, McMillon

Indeed, $30,000 obtained from Mrs. Eckel was deposited into the Insurance Marketing Service account and then withdrawn by Narciso.

In June or July of 1990, McMillon sold a medicare supplement insurance policy to Mrs. Eckel, the premium to be paid to Providential Life Insurance Company. McMillon also sold Mrs. Eckel a long-term care plan through Transport Life Insurance Company for which Mrs. Eckel paid a premium of $2,139.84. Part of the thirty thousand dollars was the source of the funds for the insurance policies purportedly purchased by Mrs. Eckel. Upon Mrs. Eckel's death, the premium payment to Transport Life Insurance Company was returned to McMillon by that insurance company. McMillon initially testified that all premiums were made payable directly to the insurance company. She later altered this testimony to admit that the premium payments were first deposited into her account. Since McMillon testified that this procedure is fairly standard, the Court wonders why McMillon was so quick to deny that the premiums were ever placed in her account.

McMillon sold a "living trust" to Mrs. Eckel. The living trust, was purportedly drawn by an attorney, and obtained from "Living Trust America," purportedly a company out of Wisconsin and/or California. No papers documenting, or even referencing, a living trust were produced at trial. Although McMillon insisted that the living trust was created to avoid probate and would take care of Mrs. Eckel's affairs, Mrs. Eckel's attorney, aware of the "living trust," advised Mrs. Eckel that she needed a Will in order to make sure her wishes were carried out. The Will does not reference a trust.[6] The descriptions of the trust are so ludicrous that the Court can only find that it was part of the general scheme to defraud Mrs. Eckel.

McMillon and Narciso entered into an "agreement" with Mrs. Eckel by which they defrauded her of virtually all of her liquid assets. The written evidence of McMillon's and Narciso's scheme consists of an agreement written on the letterhead of Insurance Marketing Services. The agreement states in full:

I, SARAH O. ECKEL, a resident of HORSESHOE BEND, IZARD COUNTY, ARKANSAS, being over the age of twenty-one (21) years and being of sound mind and memory, do hereby wish to appropriate a sum of thirty thousand ($30,000) dollars to my good friend, Albert Narciso, d.b.a. APOGEE APPRAISAL SERVICE and INSURANCE MARKETING SERVICES.

I do hereby grant that this agreement will have the following terms and conditions:

(1) Funds may be appropriated in any way Mr. Narciso wishes to disburse them as long as

(2) I, SARAH O. ECKEL, receive a guaranteed monthly income of 9.75% interest or $321.84 in either monies or services for the remainder of my natural life and that

(3) I, SARAH O. ECKEL, understand and desire this agreement will terminate without value upon my death regardless of when such death occurs

(4) That I, SARAH O. ECKEL, am making this agreement of my own free will under the same terms and conditions offered to me by MUTUAL OF NEW YORK'S straight life contract and form number 11052 (6/82)[7]

(5) I, SARAH O. ECKEL, have the right to rescind this agreement within three (3) days from this date for any reason.

The document was signed by Narciso and Mrs. Eckel, and witnessed and notarized by

should have been aware that comingling her business account was improper.

**6.** With the exception of a few personal bequests, all of Mrs. Eckel's property was left to her stepson Gary Eckel. The Will was witnessed by McMillon, a recipient of one of the small bequests.

7. The paragraph references a proposed annuity McMillon presented to Mrs. Eckel. This contract was thus to be a substitute for the annuity. McMillon testified that Mrs. Eckel preferred to be able to "help" or "invest" in Narciso while receiving monthly benefits.

McMillon. McMillon claims that Mrs. Eckel wrote this document out in long hand and that she, McMillon typed it for her. Since Mrs. Eckel did not generally even write out her own checks, the Court does not find this statement credible.[8]

McMillon and Narciso were in possession of the funds for several days prior to the time this document was signed. The checks from Edward D. Jones & Co. were given to Mrs. McMillon and deposited into McMillon's Insurance Marketing Services account by Narciso. In response to the question of whether Insurance Marketing Services received Mrs. Eckel's money, McMillon testified that it "went into the account and then went right out ... of the account." McMillon and Insurance Marketing Services in fact received the funds because the funds were deposited into McMillon's Insurance Marketing Services account. Further, when examined more closely regarding the funds, it is clear that Insurance Marketing Services retained some of the funds for the insurance premiums and the "living trust" established by McMillon. McMillon testified that $950 of the funds in fact was kept by Insurance Marketing Services as payment for the "living trust" sold to Mrs. Eckel. The general ledger of Insurance Marketing Services noted the receipt of "Money" from Sarah Eckel in the amount of $30,000 and the receipt of "Trust" funds in the amount of $945.[9] It is unclear from McMillon's testimony whether the premium to Transport Life was also deducted from the $33,952.40. In any event, even after these deductions are made, there are funds retained in the Insurance Marketing Account for which there is not even a self-serving excuse.

The transaction created by McMillon and Narciso, whatever it was meant to be, was a scheme to defraud Mrs. Eckel of her funds. McMillon rendered advice to Mrs. Eckel upon which Mrs. Eckel relied. The funds were deposited into the account of Insurance Marketing Services by Narciso and withdrawn by Narciso. No explanation was ever made as to what he did with the funds. Neither Narciso nor McMillon were able to give a reasonable explanation for the fact that the funds were placed in Insurance Marketing Services' account. Narciso asserted that it was so deposited "because that's what the stamp is on the back, and that's what shows up on this ledger." McMillon, although admitting that funds were comingled, asserted that Narciso's funds were never placed *into* Insurance Marketing Services' account. That is, Insurance Marketing Services siphoned money to Narciso, but never received any. She was unable to explain the departure from the norm in the deposit of the $30,-000, but nevertheless insisted that neither she nor Insurance Marketing Services were part of the "agreement."

McMillon's and Narciso's self-serving testimony at trial is completely at odds with the evidence. Both the words, circumstances, and the demeanor of the defendants indicate to the Court that their testimony is false. McMillon testified that the $30,000 was really just a loan "between two friends," and that neither she nor Insurance Marketing Services were part of the transaction. Alternatively, McMillon asserts that the contract was issued "as a substitute for an annuity." The document itself belies this. The agreement was typed on Insurance Marketing Services stationary, by McMillon, and specifically references Insurance Marketing Services as a party. Even if the agreement was signed only by Narciso, McMillon testified that Narciso had authority to act for Insurance Marketing Services. Presumably, Mrs. Eckel also believed this to be the case. Further, McMillon's signature appears on the document, albeit as merely a notary. The Insurance Marketing Services stationary was supposedly the only paper McMillon had. Apparently, McMillon does not

8. A friend of Mrs. Eckel, Wilma Mendenhall, took care of some financial matters for Mrs. Eckel, such as writing out checks for Mrs. Eckel's signature.

9. Mrs. McMillon appeared to have a great deal of trouble identifying her own ledger which contained the documentation that the funds had been placed in her account. The ledger also contradicted her testimony that all of Mrs. Eckel's funds had been taken by Narciso.

keep blank typing pages in her office for herself, her staff, or her agents. The Court finds this incredible. Further, she could not explain why she had typed that the thirty thousand dollars was being given to her husband "Albert Narciso, d.b.a. Apogee Appraisal Service *and Insurance Marketing Services*" when the transaction "had nothing to do with" Insurance Marketing Services.

McMillon described the document as "just a promissory note" based on the same terms and conditions as an annuity, but denied that the document was an annuity or that it was intended to be an annuity. McMillon testified that Narciso could possibly repay Mrs. Eckel within sixty days. This is inconsistent (1) with her testimony that the contract was to operate as an annuity; (2) with the terms of the agreement; and (3) with the express wishes, intent, and understanding of Mrs. Eckel, as articulated by McMillon. McMillon testified that Mrs. Eckel gave her the funds "to take care of that." This further supports the finding that McMillon and Insurance Marketing Services were part of the scheme. It is also clear that the victim believed McMillon to be part of the transaction.

Narciso also described the document: Mrs. Eckel gave him the money to do as, "I see fit—any way that I needed it." He was to repay her in installments of approximately $300 per month. Both McMillon and Narciso testified that the "loan" was to establish Narciso in his business as an appraiser. It is noteworthy that, even with an infusion of $30,000 into his "business," Narciso, as Apogee Appraisal Service, was only in the appraisal business a couple of months.[10] It appears that the appraisal business died at the same time as Mrs. Eckel. This *further indicates that the* "loan" or "annuity" was a fraudulent scheme to obtain Mrs. Eckel's savings. Defendants did not make any showing of how the funds were actually used.

That this was merely a fraudulent scheme to obtain an elderly woman's funds is further evidenced by the illegal methods used by McMillon and Narciso. The Assistant Insurance Commissioner for the State of Arkansas testified that McMillon was an active, licensed insurance agent in the state of Arkansas. She was not licensed, however, to issue an annuity. Nor was the annuity ever submitted to the insurance commission for approval, as required by Arkansas law. Insurance Marketing Services was not a licensed insurance company and neither it nor McMillon would have any authority to issue an annuity. The document Mrs. Eckel signed represents that it gives the benefits of an annuity. Even the testimony of McMillon indicates that Mrs. Eckel believed herself to be acquiring a valid, legal annuity. Both McMillon and Narciso now state (sometimes) that the transaction was merely a "loan" from one "friend" to another.

McMillon testified that Mrs. Eckel said: "I'd rather help your husband get started with his business" as a licensed appraiser.[11] Defendants also represented to Mrs. Eckel that Narciso had a government contract "pending." The contract, however, did not materialize. There was no credible evidence at trial that the even the prospect of such a contract existed.

In any event, McMillon and Narciso advised Mrs. Eckel that they could arrange for Mrs. Eckel to earn more from her funds. Based upon these representations, Mrs. Eckel's $30,000, earning up to 15% interest at Edward D. Jones & Co., was withdrawn by McMillon, placed in the Insurance Marketing Services account and then withdrawn by Narciso. The "loan" document or "annuity" provided that Mrs. Eckel was to earn 9.75% interest. McMil-

10. Apogee is the point in the orbit of a celestial body most distant from the earth. The Court finds this name most apropos in the context of this case.

11. McMillon's description of Mrs. Eckel at this point is in marked contrast to her own and Gary Eckel's *previous testimony. The statements* made by McMillon describe an elderly woman who is permitting others to not only take part in her affairs but is also giving them money on extremely flimsy documents. This testimony is contrast to the testimony regarding Mrs. Eckel's "feistiness" and stubbornness with regard to her finances.

lon and Narciso were apparently giving Mrs. Eckel advice without ever finding out what Mrs. Eckel's investments were. This supports the finding that McMillon and Narciso were not helping Mrs. Eckel, but were only interested in obtaining the $30,000 for their own use and benefit, without any intent to repay the funds.[12]

The defendants made fraudulent representations and statements to Mrs. Eckel upon which she relied. McMillon admitted that Mrs. Eckel relied upon her advice. McMillon advised Mrs. Eckel regarding insurance matters and filed claims for expenses several years old, thus gaining Mrs. Eckel's confidence. McMillon advised Mrs. Eckel regarding annuities as an investment and fraudulently represented that she could give her, or at least assist her in obtaining, an annuity from Narciso. She also represented to Mrs. Eckel that she and Narciso in fact issued an annuity to Mrs. Eckel.

Both defendants represented to Mrs. Eckel that the document she signed was an annuity. It is clear from the evidence that Mrs. Eckel wanted an annuity and that she understood, from the words and actions of the defendants and from the language of the agreement itself, that the document she signed was an annuity. McMillon advised Mrs. Eckel on annuities and even drafted an application with Mutual of New York for an annuity. The agreement itself purports to incorporate the terms of that specific annuity contract. The only deposit in Mrs. Eckel's account, made from Narciso's purported payments, was on September 28, 1990, recorded in her check register as "Deposit—annuity check." Thus the evidence shows Mrs. Eckel believed she had an annuity from both defendants. She could only have arrived at this conclusion from the language of the agreement and the statements of the defendants which she believed and upon which she relied to the extent of over thirty thousand dollars.

Narciso is equally liable for any statements made by McMillon, just as McMillon is liable for statements made by Narciso, by virtue of their common fraudulent scheme. *See Malakul v. Altech Arkansas, Inc.*, 298 Ark. 246, 766 S.W.2d 433, 437 (1989) ("[O]ne who accepts the fruit of fraud, knowing the means by which they were obtained, is liable therefore even though he did not personally participate in the fraud."). The Court finds, too, that Narciso made his own directly fraudulent representations. He represented that Mrs. Eckel would receive payments from him. In setting up the scheme, two payments were purportedly made to Mrs. Eckel before the agreement was even signed.[13] McMillon's testimony that Narciso was supposed to pay back the money "if he could have" further highlights the fact that the defendants did not intend, at the time they signed the agreement, to repay the funds. Given the rapidly deteriorating state of Mrs. Eckel's health, the fact that Narciso may have made two or three payments on the "note" to Mrs. Eckel, does not persuade the Court that there existed any real intent to repay the funds or provide an annuity.

The defendants' representations were false and they knew them to be false at the time they were made. While it appears that McMillon and Narciso had differing roles and may have made different representations[14] to Mrs. Eckel they were part-

---

12. When interrogated regarding the payments, McMillon indicated that two or three payments had been made to Mrs. Eckel. The answers to interrogatories signed by defendants' counsel stated that no payments had been made. Narciso denied having ever seen the interrogatories or having ever said that no payments were made.

13. Both McMillon and Narciso testified that three payments were made to Mrs. Eckel. McMillon testified that payments were made as follows: first—two weeks after the contract; second—in September; third—in October. Nar-

ciso testified that two payments were made before the agreement was entered into. Narciso testified that the payments were made in August, September, and October. He also testified that the payments were made in July, August, and September. Mrs. Eckel's check register indicates that only one deposit was made into her account in the approximate contract amount, on September 28, 1990.

14. The testimony of these perpetrators is self-contradictory and contradict each other such that it is extremely difficult to know precisely what occurred.

ners in the scheme to defraud Mrs. Eckel of her money.

The evidence clearly showed that the defendants obtained $33,952.40 from Mrs. Eckel by actual fraud within the meaning of section 523(a)(2)(A). Accordingly, this Court will enter judgment in favor of the plaintiff against both defendants: the $33,952.40 debt to the heirs of Sara O. Eckel is non-dischargeable pursuant to section 523(a)(2)(A).

IT IS SO ORDERED.